## COMMONWEALTH *vs.* DENNIS L. GOULD.

Norfolk.   December 4, 1979. — May 20, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Homicide.   Insanity.   Practice, Criminal,* Capital case.

Where at a murder trial the evidence, considered without regard to the
   defendant's mental disease, was sufficient to support a conviction of
   murder in the first degree, there was no error in denying the defend-
   ant's motion for a directed verdict on so much of the indictment as
   charged murder in the first degree. [679]

Evidence of a defendant's mental illness may be considered on the issue
   of the specific intent required for murder in the first degree based on
   deliberate premeditation. [680-683]

Evidence of a defendant's mental illness may be considered on the issue
   whether or not a murder was committed with extreme atrocity or
   cruelty. [683-686] QUIRICO, J., with whom HENNESSEY, C.J., joined,
   dissenting.

Where there was evidence at a murder trial that the defendant suffered
   from a mental illness, this court exercised its powers under G. L.
   c. 278, § 33E, to order a new trial at which the defendant would be
   permitted to produce evidence on the issue whether or not the impair-
   ment of his mental processes precluded him from being able to deliber-
   ately premeditate and the jury would be permitted to consider the
   defendant's mental impairment on the issue whether he committed the
   murder with extreme atrocity or cruelty [686]; QUIRICO, J., with
   whom HENNESSEY, C.J., joined, would have the court exercise its
   powers under G. L. c. 278, § 33E, to order a new trial on the basis
   that, upon consideration of the entire evidence of insanity, there was a
   substantial likelihood of a miscarriage of justice [687-689].

INDICTMENT found and returned in the Superior Court
Department on July 24, 1978.

The case was tried before *Dwyer,* J.

*Robert Snider* for the defendant.

*Charles J. Hely,* Assistant District Attorney, for the Com-
monwealth.

ABRAMS, J. On July 17, 1978, the defendant fatally stabbed his former girl friend. After a witness to the attack intervened and told the defendant to stop, he mumbled, "I attacked her. She was impure . . . [i]mpure, impure." For more than five years preceding the fatal stabbing the defendant had suffered from constant, fixed delusions in which he believed that he had a divine mission on earth and that he was required to kill his girl friend because she was "impure." After a trial at which criminal responsibility was the sole issue, the jury convicted the defendant of murder in the first degree. The defendant appeals. See G. L. c. 278, §§ 33A-33G.

Initially, the defendant argues that it was error for the judge to have denied his motion for a verdict of not guilty on so much of the indictment as alleged murder in the first degree.[1] Alternatively, the defendant asks that we order a new trial or reduce the verdict to murder in the second degree pursuant to G. L. c. 278, § 33E.

Although we find no error at trial, pursuant to our power under G. L. c. 278, § 33E, we think the defendant is entitled to a new trial at which he may produce expert testimony on the issue whether or not the impairment of his mental processes precluded him from being able to deliberately premeditate. At a new trial the jury may also consider the defendant's mental impairment on the issue whether he committed the murder with extreme atrocity or cruelty.

We summarize the evidence. At approximately 7 A.M. on July 17, 1978, the defendant was seen in a restaurant near the nursing home where the victim worked. Shortly afterward witnesses observed him keeping the nursing home

---

[1] Within five court days after the jury was discharged, the defendant moved to renew his motion for a directed verdict made after the close of the Commonwealth's case, and, in the alternative, moved for a new trial. See G. L. c. 278, § 11. As grounds for this motion, the defendant maintained that he was not capable of forming the requisite intent for murder in the first degree and that the verdict was against the weight of the evidence. After hearing, the motion was denied. Thereafter, the defendant perfected his appeal, briefing only the propriety of the denial of his motion for a directed verdict.

under surveillance from a covert position. James McPherson drove into the parking lot of the nursing home at approximately 8:30 A.M., and observed the defendant leaning on the back of a van. The victim walked down a ramp from the parking lot to the building. McPherson saw the defendant go "right down after [the victim]," and then saw the defendant on top of the victim, apparently beating her. McPherson ran down the ramp and yelled at the defendant to stop. The defendant straightened up, dropped his knife, and permitted McPherson to seat him on a wall abutting the ramp. McPherson left the defendant to get help for the victim. When he returned, the defendant was again stabbing the victim. Once more, McPherson told the defendant to sit down on the wall; after one final lunge at the victim, the defendant did so, and remained there until the police came. McPherson testified that the defendant was bleary-eyed and "excited," and that he repeatedly stated that she was "impure."

Quincy policeman Kevin Murphy arrived at the nursing home at approximately 9 A.M., and observed the victim lying at the foot of the ramp, covered with blood, and gasping for breath. A knife protruded from underneath her left breast.[2] Officer Murphy placed the defendant under arrest and recited the Miranda warnings. In response to a question, the defendant told the officer, "There was nobody with me. I did it myself." Officer Murphy testified that the defendant's shirt and arm were covered with blood when he first saw him; otherwise, he appeared "natural."

The defendant was interrogated at the Quincy police station at approximately 11 A.M., and a transcription of a tape recording of that interview was read in evidence.[3] During

---

[2] The victim died that day as a result of multiple stab wounds with massive hemorrhage. The pathologist testified that there were thirty-one stab wounds, including wounds to her head, chest, abdomen, left arm, and left leg.

[3] Prior to the introduction of the tape transcription, the trial judge sua sponte raised the question of the voluntariness of the defendant's statements. Defense counsel took the position that the statements not only indicated that the defendant had committed the crime (which was not

this interview, the defendant, appearing somewhat nervous, described his acquaintance with the victim,[4] and his history of hospitalization at various mental institutions since approximately 1973. He admitted that he had intentionally caused his right arm to be amputated by falling on a train track. The defendant started to describe the earlier events of that morning, but claimed not to remember anything between the time he got out of his car and the time he found himself sitting on the wall (for what the evidence indicated was the second time). After the tape recorder was turned off, the defendant said, "I know why I did it," but refused to explain.

---

contested), but also that the defendant lacked criminal responsibility. It is clear, as the judge expressly found, that "both sides want it for whatever purposes and value they see in it." Indeed, defense counsel stated to the judge at a bench conference that part of his argument was that the defendant made no attempt to escape and confessed immediately. The record reflects an over-all defense strategy of waiving evidentiary objections so as to frame the criminal responsibility issue in the fullest possible way for the jury.

Because it is clear from the record that the defendant, as a matter of trial strategy, waived any rights he might have to object to the admission of his statements as evidence against him, no issue such as that presented in *Commonwealth* v. *Cole, ante* 30, 39-41 (1980) is presented to us. Cf. *Commonwealth* v. *Brady, ante* 44, 57-58 (Abrams, J., concurring 1980). See generally *Commonwealth* v. *Chung,* 378 Mass. 451 (1979); *Commonwealth* v. *Johnston,* 373 Mass. 21 (1977); *Commonwealth* v. *Harris,* 371 Mass. 462, 469-470 (1976).

At one point during the interview, the defendant responded to a question by saying, "I'd just rather keep it quiet until I see a lawyer." The interrogation continued, and the defendant went on to make further statements. The defendant did not challenge these further statements, at trial or on appeal, as violative of *Miranda* v. *Arizona,* 384 U.S. 436 (1966). It is clear that this decision was also part of the defense strategy to prove the defendant was not responsible for his conduct.

[4] The defendant had met the victim in early 1973 and dated her regularly until the summer of 1973 when she terminated the relationship after the defendant became delusional and threatened her with a knife. There was testimony that the defendant made frequent threats against the victim. Six months before the homicide the defendant had again threatened the victim. The defendant was placed on probation for two years, and was under court order not to contact the victim or go near her house.

At one point all but one police officer left the room, and the defendant made several spontaneous statements. The defendant stated that he was commanded to commit the murder: "The rabbi looked at me from his pulpit and told me 'thou shalt kill her.'" He said that he probably would not go to jail or to a hospital, but that he would instead be taken to Israel and tortured or nailed to a cross. He asked the officer what "they" would do to him if they found out he was Jesus Christ. Finally, the officer testified, the defendant said "that she was impure, that all Jewish women were impure, 'including [his] mother . . . ,'" and that he thought what he did was "right." The officer added that the defendant appeared normal throughout this conversation.

It was uncontradicted that the defendant had a long-standing, constant delusional belief system.[5] The defendant's delusions were religious in nature. He believed that he was the Messiah; he believed that he was the Saviour of the Jewish people; he believed that he was required by God to kill the victim because of his divine mission and because she was "impure."

From 1973 until 1978, the defendant was in and out of various institutions for the mentally ill.[6] The defendant was treated with drugs and psychotherapy; as a result he was better able to think and perceive reality, although he never gave up his delusional ideas.

---

[5] There was expert testimony in the record defining a delusional belief system as a false set of beliefs which distort reality and cannot be reasoned away.

[6] According to testimony by the psychiatrist who treated the defendant, the defendant was twice admitted to Worcester State Hospital in 1973. He was hospitalized for approximately fifteen months. In April, 1975, the defendant was admitted to Massachusetts General Hospital after he had intentionally placed his right arm under the path of a trolley car so that it would be amputated. He was transferred from Massachusetts General Hospital's psychiatric unit to Worcester State Hospital, and then to McLean Hospital in Belmont. He was released from McLean in October, 1975, but continued as an outpatient until the homicide, with the exception of a brief period of hospitalization in August, 1976.

The Commonwealth's expert[7] diagnosed the defendant's mental illness as paranoid psychosis.[8] The expert said that during the course of his interviews with the defendant, the defendant took responsibility for the killing. The defendant told the doctor that he could not "justify a killing," that he (the defendant) could not "say whether it was wrong or it was right" and that he could "only sanctify it" (i.e., the killing).[9]

The expert testified that the defendant also stated "that he knew at the time of the stabbing that his actions were illegal in the Commonwealth of Massachusetts and were considered to be wrong by society, that he could have stopped himself from stabbing the victim and that he was responsible for what he had done." The defendant later told the expert that he sometimes thought he might "get off through insanity."

The expert concluded that, despite the defendant's mental illness, the defendant appreciated, at the moment of the homicide, that his act was "immoral, wrong and a criminal and illegal thing to do," and that "he was capable of controlling his behavior to such an extent that he could have stopped himself from doing it." In essence, the expert admitted that the defendant's mental powers were impaired,

---

[7] As a matter of discretion the judge granted the defendant's request that the Commonwealth be required to present affirmative evidence of criminal responsibility in its case-in-chief because the defendant had filed notice of his intention to raise the issue of criminal responsibility. See *Blaisdell* v. *Commonwealth,* 372 Mass. 753, 767 (1977); Mass. R. Crim. P. 14 (b) (2), 378 Mass. 878 (effective July 1, 1979).

[8] Every other doctor who had examined the defendant both before and after the crime had diagnosed him as a paranoid schizophrenic. On cross-examination, the Commonwealth's expert acknowledged that the defendant's mental illness "may even be schizophrenia," but stated he would need further evidence as to auditory and visual hallucinations before he would change his diagnosis.

[9] The defendant also told the Commonwealth's expert that the day before the homicide, he heard a rabbi in the temple say, "When the rod is hot, strike, so I did." The expert considered this significant because on a previous occasion, when a female psychologist asked the defendant to interpret the proverb "strike when the rod is hot," the defendant attacked her, thinking she meant for him to rape her.

but could not "quantify" the degree of the impairment except to say it was not "substantial."

The defense in this case consisted solely of the testimony of psychiatrists on the issue of criminal responsibility. Dr. Larry Strasburger and Dr. John Snell[10] both testified that the defendant had suffered from a severe and long-standing mental illness, namely, paranoid schizophrenia, and that this was a "clear-cut" and "straightforward" case of lack of criminal responsibility.

Dr. Strasburger testified that the defendant's chronic disease had led to a functional impairment which made him unable to appreciate the consequences of his actions in a normal, rational way,[11] and to "widespread difficulty checking hostile impulses." Although massive drug treatment improved the defendant's thought disorder, his underlying delusional system remained unchanged. Thus, he might appear to function normally for some period of time, but stress or anxiety would cause his delusional thinking to predominate. Dr. Snell's testimony focused on the

[10] A third psychiatrist testified that he had treated the defendant over a three-year period and that as a result of psychotherapy and drug treatment, the defendant for the most part had adequate ability to think and accurately perceive reality, although he never gave up his delusional ideas. The doctor said that the defendant's condition was much worse at some times than others because "[v]ariability is the hallmark of schizophrenia." The doctor testified that he last saw the defendant on July 11, 1978, at which time the defendant appeared to be in touch with reality and was "[r]eally no different than he had been over most of the three years [the doctor] had seen him." He did not give an opinion on the defendant's criminal responsibility on July 17, 1978, because he never interviewed the defendant after the homicide.

[11] The defendant's statements to Dr. Strasburger were used to illustrate the quality of the defendant's irrational thinking. When asked about the incident, the defendant said, "I didn't want her to die. It was something I had to do. Like in war, when you kill someone, you're not doing the right thing. It's like war. You have to, even though it's not the right thing." When asked directly whether he knew that killing the victim was against the law, the defendant replied, "I wrote the law, the Ten Commandments. That's the law." When asked what he thought about the whole thing in retrospect, he said, "When you're at war, captured, sometimes you escape. I plan to escape, not from here but from everywhere. Let everyone escape. Open the doors so the blind can see and the deaf can hear."

causal relationship between the homicide and the defendant's delusions. Dr. Snell testified that the defendant's crime was a direct outgrowth of his delusions and that the defendant could not view his conduct in a rational way, but only viewed his actions as divine.

*Motion for directed verdict.* The defendant argues, on the basis of two distinct theories, that the Commonwealth's evidence was insufficient as a matter of law to support a conviction of murder in the first degree. Therefore, he claims the judge should have directed a verdict of not guilty of murder in the first degree, thus making murder in the second degree the most severe verdict that could be returned. Initially, the defendant claims that as a result of his mental abnormality he could not form the specific intent required for murder in the first degree. Alternatively, the defendant argues that because of the unanimity of psychiatric opinion that there was a causal connection between his long-standing mental illness and the crime, the judge was required to direct a verdict on the charge of murder in the first degree.[12]

The same short answer applies to each of these arguments. The defendant concedes that the evidence, considered without regard to the defendant's mental disease, was sufficient to support a conviction of murder in the first degree. Directing a verdict in these circumstances would constitute an unwarranted invasion of the province of the jury. See G. L. c. 265, § 1 (the jury determine the degree of murder). Moreover, jurors find the facts, including those facts or issues on which they hear psychiatric testimony. *Commonwealth* v. *Kostka,* 370 Mass. 516, 535-536 (1976). "The law should not, and does not, give the opinions of experts . . . the benefit of conclusiveness, even if there are no contrary opinions introduced at the trial." *Commonwealth* v. *Smith,* 357 Mass. 168, 178 (1970). Thus, there was no error in the denial of the defendant's motion for a directed verdict of not guilty of murder in the first degree.

---

[12] There was, however, no unanimity of opinion regarding the issue of criminal responsibility as defined by *Commonwealth* v. *McHoul,* 352 Mass. 544 (1967).

*Relief pursuant to G. L. c. 278, § 33E.* The defendant also argues, however, that we should exercise our supervisory power, and either grant him a new trial or reduce his conviction to murder in the second degree. Our duty under G. L. c. 278, § 33E, is to consider broadly the whole case on the law and the facts to determine whether the verdict is "consonant with justice." *Commonwealth* v. *Davis, ante* 1, 15 n.20 (1980), quoting from *Commonwealth* v. *Seit,* 373 Mass. 83, 94 (1977). "General Laws c. 278, § 33E, 'operates as a type of "safety valve" by ensuring review as to all aspects of cases regardless of the absence of claim of error.' *Commonwealth* v. *Brown,* 376 Mass. 156, 168 (1978). See *Commonwealth* v. *Hall,* 369 Mass. 715, 736 (1976) ('The broad scope of the review which this court is required to make under G. L. c. 278, § 33E, in a capital case is not limited to questions based on exceptions saved during the course of the trial'). See also *Commonwealth* v. *Williams,* 364 Mass. 145, 151 (1973). In short, while recognizing that the power of this court under § 33E is to be exercised with restraint, *Commonwealth* v. *Hooks,* 375 Mass. 284 (1978), we have not hesitated to act under § 33E in appropriate cases . . . ." *Commonwealth* v. *Cole, ante* 30, 38-39 (1980). We conclude that this is an appropriate case for the exercise of our power under § 33E. Although the trial judge was scrupulous in his concern for the problems raised by the defendant's mental illness and indeed went to considerable lengths throughout the trial to safeguard the defendant's rights, for the reasons set out, *infra,* we think a new trial is required.

1. Deliberate premeditation. The record raises a substantial issue as to deliberate premeditation; namely, should a judge instruct the jury that they may consider a defendant's long-standing mental illness in ascertaining whether the defendant had sufficient mental capacity to deliberately premeditate the acts charged? We have previously held that a jury may consider a defendant's voluntary use of liquor (i.e., drunkenness) or a defendant's voluntary use of narcotics or harmful drugs on the issue of deliberate pre-

meditation. If a defendant who has voluntarily used alcohol or drugs is found by the jury to be incapable of deliberately premeditating the acts charged, he may not be found guilty of murder in the first degree but may be found guilty of murder in the second degree. *Commonwealth* v. *Costa,* 360 Mass. 177, 186 (1971). *Commonwealth* v. *Delle Chiaie,* 323 Mass. 615, 617-618 (1949). *Commonwealth* v. *Taylor,* 263 Mass. 356, 362-363 (1928). This rule "is merely an application of the ordinary rules of law pertaining to the requisite mental state for conviction of a particular crime charged." *Commonwealth* v. *Mazza,* 366 Mass. 30, 34 (1974).

We think there is no justifiable reason to treat the effect of the defendant's involuntary mental illness on his capacity for deliberate premeditation in a manner different from the effect of the voluntary use of liquor or drugs. "Neither logic nor justice can tolerate a jurisprudence that defines the elements of an offense as requiring a mental state such that one defendant can properly argue that his voluntary drunkenness removed his capacity to form the specific intent but another defendant is inhibited from a submission of his contention that an abnormal mental condition, for which he was in no way responsible, negated his capacity to form a particular specific intent, even though the condition did not exonerate him from all criminal responsibility." *United States* v. *Brawner,* 471 F.2d 969, 999 (D.C. Cir. 1972).[13]

---

[13] The principle of the *Brawner* case is reflected in the decisions of numerous courts: *United States* v. *Erskine,* 588 F.2d 721 (9th Cir. 1978); *Hughes* v. *Mathews,* 576 F.2d 1250 (7th Cir.), cert. dismissed sub nom. *Israel* v. *Hughes,* 439 U.S. 801 (1978); *Commonwealth* v. *Walzack,* 468 Pa. 210 (1976); *State* v. *Cooper,* 286 N.C. 549 (1975); *State* v. *Anderson,* 515 S.W.2d 534 (Mo. 1974); *State* v. *Santiago,* 55 Haw. 162 (1973); *State* v. *Shaw,* 106 Ariz. 103 (1970) (by implication), cert. denied, 400 U.S. 1009 (1971); *Gallegos* v. *People,* 159 Colo. 379 (1966); *Starkweather* v. *State,* 167 Neb. 477 (1958); *Mangrum* v. *Commonwealth,* 19 Ky. L. Rep. 94 (1897). See cases collected in Lewin, Psychiatric Evidence in Criminal Cases for Purposes Other Than the Defense of Insanity, 26 Syracuse L. Rev. 1051, 1105-1115 (1975), and *Pfeiffer* v. *State,* 44 Md. App. 49, 57 n.4 (1979). See also Model Penal Code § 4.02 (Proposed Official Draft 1962); Annot., 22 A.L.R.3d 1228 (1968).

Permitting a jury to consider whether a defendant's mental illness affected his capacity to deliberately premeditate is not tantamount to adopting a doctrine of diminished responsibility. This change merely broadens our present practice by allowing jury consideration of mental impairment as well as voluntary intoxication on the issue of deliberate premeditation. Our rule "contemplates full responsibility, not partial, but only for the crime actually committed." *State* v. *Padilla*, 66 N.M. 289, 292 (1959). See *Battalino* v. *People*, 118 Colo. 587 (1948). Evidence of the defendant's mental disease, like voluntary intoxication, bears on the specific intent required for murder in the first degree based on deliberate premeditation. See *Commonwealth* v. *Sheehan*, 376 Mass. 765, 775-776 (1978).

The Commonwealth suggests that *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967), does not permit the jurors to consider the defendant's mental illness on the degree of murder or on the issue of specific intent. Evidence of the defendant's mental illness is said to be relevant only to the issue of criminal responsibility. We disagree. "It would be a legal as well as a logical incongruity to hold that the crime of murder in the first degree could only be committed after deliberate thought or premeditated malice, and yet that it might be committed by one who was without mental capacity to think deliberately or determine rationally." H. Weihofen, Mental Disorder as a Criminal Defense 178 n.9 (1954), quoting from *Aszman* v. *State*, 123 Ind. 347, 352 (1889). See Model Penal Code §§ 4.01 and 4.02 (Proposed Official Draft 1962). See also Comments to §§ 4.01 and 4.02, in particular, Appendix C, Excerpts from Correspondence Between Dr. Manfred Guttmacher and Herbert Wechsler (Tent. Draft No. 4 1955). See generally Arenella, The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage, 77 Colum. L. Rev. 827, 828-829 (1977); H. Weihofen, Mental Disorder as a Criminal Defense 176-179 (1954); *Commonwealth* v. *Trippi*, 268 Mass. 227, 231 (1929). To the extent that cases such as *Commonwealth* v. *Sires*, 370 Mass. 541, 547 (1976),

and *Commonwealth* v. *Costa,* 360 Mass. 177, 185-186 (1971), are inconsistent with this result, we no longer follow them.

We conclude that psychiatric testimony may properly be offered to distinguish "between 'intent' in the sense of a conscious desire, 'planning' in the sense of considering the mechanical feasibility of effectuating that desire, and 'premeditation' in the sense of critically evaluating the pros and cons of proceeding to effectuate the desire [thereby explaining] in understandable terms how a person could logically entertain an intent, plan the effectuation of that intent, but not [deliberately] premeditate regarding the objective of that intent." Dix, Psychological Abnormality as a Factor in Grading Criminal Liability: Diminished Capacity, Diminished Responsibility, and the Like, 62 J. Crim. L., Criminology & Police Sci. 313, 325 (1971). If expert testimony to this effect is elicited, then the judge should instruct the jury that the defendant's mental illness may be considered on the issue of deliberate premeditation. The instruction should be in accordance with *Commonwealth* v. *Delle Chiaie,* 323 Mass. 615, 617-618 (1949).

2. *Extreme atrocity or cruelty.* The evidence at trial was sufficient to warrant the judge's action in submitting to the jury the issue whether the murder was committed with extreme atrocity or cruelty. The defendant, however, suggests that the jurors "should have been able to have considered the manner of the homicide [as it] related to the defendant's mental illness." [14]

---

[14] The defendant made this suggestion in the course of his argument that it was an error of law to permit the jurors to consider murder in the first degree. The defendant does not ask us to reconsider the question whether we should require jurors to find a mental intent in addition to malice aforethought for conviction of murder in the first degree based on extreme atrocity or cruelty. We are aware of the fact that the Massachusetts statute defining the degrees of murder differs from the statutes of many other States where murder by torture is penalized as murder in the first degree. Generally such statutes have been construed to require intent to inflict pain or suffering or both. See *Deutscher* v. *State,* 95 Nev. 669, 677 n.5 (1979); *State* v. *Morales,* 120 Ariz. 517, 522-524 (1978); *People* v. *Steger,* 16 Cal. 3d 539, 543-546 (1976); *State* v. *Taylor,* 163 Mont. 106, 120

"Under our cases the inquiry focuses both on the defendant's actions, in terms of the manner and means of inflicting death, and on the resulting effect on the victim . . . ." *Commonwealth* v. *Lacy,* 371 Mass. 363, 367 (1976). See *Commonwealth* v. *Monsen,* 377 Mass. 245, 253 (1979). On occasion, however, we have considered factors such as a defendant's taking pleasure in causing pain to his victim as relevant to whether the murder was committed with extreme atrocity or cruelty. *Commonwealth* v. *Gilbert,* 165 Mass. 45, 59 (1895). "Indifference to the victim's pain, as well as actual knowledge of it and taking pleasure in it, is cruelty; and extreme cruelty is only a higher degree of cruelty." *Commonwealth* v. *Golston,* 373 Mass. 249, 260 (1977), cert. denied, 434 U.S. 1039 (1978) (evidence that the defendant struck the fatal blow "[f]or kicks" relevant as to whether the murder was committed with extreme atrocity or cruelty). Cf. *Commonwealth* v. *Satterfield,* 362 Mass. 78, 82 (1972) (crime committed with such savagery and brutality as to constitute murder committed with extreme atrocity or cruelty); *Commonwealth* v. *McGarty,* 323 Mass. 435, 440 (1948) ("Repeated violent blows have been held to evince such ferocity as would warrant a finding of extreme atrocity and cruelty"). See *Commonwealth* v. *Bartolini,* 299 Mass. 503, 515-516, cert. denied, 304 U.S. 565 (1938); *Commonwealth* v. *Devlin,* 126 Mass. 253, 255 (1879). Surely, if a malicious mind may be considered as evidence that a defendant committed a murder with extreme atrocity or

(1973). See generally Annot., 83 A.L.R.3d 1222 (1978). Although legislative documents which preceded the passage of St. 1858, c. 154 (which first enacted the murder statute in substantially its present form), indicate that the drafters intended to reserve the greater punishment of murder in the first degree for those persons found guilty of "wilful and premeditated killing," it is clear, as pointed out in the separate opinion, *infra* at 689, that subsequent judicial decisions did not equate extreme atrocity or cruelty with a "wilful and premeditated" intent. See Report of the Penal Code of Massachusetts, Homicide § 4 n.(*c*), at 6, and § 26 n.(*v*), at 19 (1844). See generally *Commonwealth* v. *Dickerson,* 372 Mass. 783, 802-805 (1977) (Quirico, J., concurring); *Commonwealth* v. *Desmarteau,* 16 Gray 1, 9 (1860).

cruelty, then fairness requires that an impaired mind may also be considered as evidence bearing on whether or not the defendant committed the murder with extreme atrocity or cruelty. But see *Commonwealth* v. *Monsen*, 377 Mass. 245, 254-255 (1979).

We think that, in a case in which the major issue is the effect of the defendant's serious, long-standing mental illness on the conduct complained of, there is no logical reason why the jurors should not be allowed to consider the defendant's mental illness and its effect on his conduct. It is the teaching of our cases that the jurors, "as the repository of the community's conscience, [must] determine when the mode of inflicting death is so shocking as to amount to extreme atrocity or cruelty." *Commonwealth* v. *Connolly*, 356 Mass. 617, 628, cert. denied, 400 U.S. 843 (1970). See *Commonwealth* v. *Golston*, 373 Mass. 249, 260 (1977), cert. denied, 434 U.S. 1039 (1978); *Commonwealth* v. *Knowlton*, 265 Mass. 382, 388 (1928). The jurors' broad discretion will more accurately reflect the community's conscience, goals, and norms, if the jurors are not arbitrarily restricted to considering only the defendant's course of action, but are also permitted to consider the defendant's peculiar mental state [15] as an additional factor to be weighed in de-

---

[15] In many respects, our decision to permit jury consideration of the defendant's mental state was foreshadowed by *Commonwealth* v. *Cadwell*, 374 Mass. 308 (1978), which involved the beating death of a four year old child. In *Cadwell*, a majority of the court determined that in light of the facts of the case and the unique emotional, psychological, and sociological features of the battered child syndrome, a verdict of murder in the second degree was "more consonant with justice." *Commonwealth* v. *Seit*, 373 Mass. 83, 94 (1977). See G. L. c. 278, § 33E. The majority recognized the crime as "abhorrent" but said that in such a case it is imperative to guard against "too passional a reaction," *Cadwell, supra* at 319, and concluded that the case warranted the exercise of this court's § 33E power to reduce the verdict to murder in the second degree. Cf. *Commonwealth* v. *Satterfield*, 362 Mass. 78 (1972). Since Cadwell did not claim that he lacked criminal responsibility, the majority ordered the verdict reduced to murder in the second degree without a retrial. In the instant case, the defendant's claim that he lacked criminal responsibility, and the evidence adduced in support of that claim, require a new trial. We intimate no view on what an appropriate verdict should be.

termining whether the murder was committed with extreme atrocity or cruelty. Impairment of a defendant's ability to make a decision in a normal manner may have a direct bearing on the degree of murder, and consequently, on the issue of extreme atrocity or cruelty. "[P]sychological abnormality bears on 'personal turpitude,' and the law, if it is to maintain the community's respect, must grade its condemnation according to the moral turpitude of the offender as the community evaluates it. The need to have criminal law accurately express community condemnation therefore requires this investigation [i.e., jury consideration of the entire circumstances of the crime, including a defendant's mental impairment]." Dix, *supra* at 332.

At a retrial the jurors are to consider the totality of the evidence, including the defendant's mental illness, on the issue of extreme atrocity or cruelty.[16] Consideration of the defendant's impaired capacity as well as the character of his acts is essential if the jury is to serve fully and fairly as the community's conscience in separating extreme atrocity or cruelty from that atrocity or cruelty inevitably included in the destruction of any human life.

---

Our result today is consistent with the spirit and theory of the Model Penal Code, §§ 4.01 and 4.02 (Proposed Official Draft 1962), and *Commonwealth* v. *McHoul,* 352 Mass. 544 (1967).

[16] Hereafter, in addition to the traditional instructions on extreme atrocity or cruelty the judge may also instruct the jurors that if they find from the evidence that the defendant had substantially reduced mental capacity at the time the crime was committed, they may consider what effect, if any, the defendant's impaired capacity had on his ability to appreciate the consequences of his choices. Thus, the defendant's mental impairment is to be weighed in evaluating the evidence of the manner and means of inflicting death, the instrumentalities employed, any disproportion between the means actually needed to inflict death and those employed, the consciousness and degree of suffering of the victim, and the extent of the victim's physical injuries, factors customarily associated with extreme atrocity or cruelty. See *Commonwealth* v. *Cadwell, supra* at 318; *Commonwealth* v. *Golston,* 373 Mass. 249, 260 (1977), cert. denied, 434 U.S. 1039 (1978); *Commonwealth* v. *Lacy,* 371 Mass. 363, 367 (1976); *Commonwealth* v. *Gilbert,* 165 Mass. 45, 59 (1895).

Pursuant to our power under G. L. c. 278, § 33E, the judgment is reversed, the verdict is set aside, and a new trial is ordered.

*So ordered.*

QUIRICO, J. (with whom Hennessey, C.J., joins, concurring in part and dissenting in part). While I concur with the granting of a new trial to the defendant in the exercise of our powers under G. L. c. 278, § 33E, I would do so for a reason different from that relied on by the court in the part of its opinion entitled "1. Deliberate premeditation." However, I am unable to agree with the court's reasoning and holding in the part of its opinion entitled "2. Extreme atrocity or cruelty," and I therefore respectfully dissent therefrom.

1. *Basic reason for granting a new trial.* The court properly rejects the defendant's claim that the judge should have reduced the charge as submitted to the jury, to that of murder in the second degree because of the insufficiency of evidence of deliberate premeditation. I believe that there was sufficient evidence of deliberate premeditation, and that there was also sufficient evidence that the homicide was committed with extreme atrocity or cruelty, with the result that the case was properly submitted to the jury on the charge of murder in the first degree.

The defendant expressly argues for our adoption of a "diminished capacity" rule, but limited in application to the determination whether he had the capacity to deliberately premeditate the homicide. The court in effect adopts that approach and, in the exercise of its powers under G. L. c. 278, § 33E, grants him a new trial on the ground that the judge failed to instruct the jury that if they found that the defendant was suffering from a mental disease by reason of which he was incapable of deliberately premeditating the homicide, he could not be found guilty of murder in the first degree. The court attempts to distinguish the principle on which it bases that decision from the doctrine of "diminished capacity," which has been frequently, and again quite recently, rejected by this court. *Commonwealth* v. *McGuirk,*

376 Mass. 338, 345-346 (1978). *Commonwealth* v. *Johnson*, 374 Mass. 453, 461-465 (1978). *Commonwealth* v. *Sires*, 370 Mass. 541, 546-547 (1976), and cases cited.

The court's decision in this respect probably represents no great change in our law on this subject because the Commonwealth, when seeking a conviction for murder in the first degree "committed with deliberately premeditated malice aforethought" (G. L. c. 265, § 1), has always had the burden of proving the element of deliberate premeditation, and that impliedly includes the burden of proving that the defendant had the capacity to deliberately premeditate the homicide.

I am not concerned here with the technical question whether the evidence was sufficient to support the jury's implied finding that the defendant possessed the mental capacity prescribed by our decision in *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967), as necessary to render him criminally responsible for the homicide. Rather, I am concerned with the broader question whether we can reasonably and fairly conclude, upon consideration of the entire evidence of insanity (which is not limited to the testimony of the psychiatrists), that there is no substantial likelihood of a miscarriage of justice in these circumstances. In such a case it is not enough, nor is it a proper discharge of our responsibility under § 33E, to base our decision solely on the fact that there was some evidence, in this case the testimony of one psychiatrist, to support the jury's conclusion that the defendant was legally competent and criminally responsible for his act. If that were the sole test there would be no need or occasion for the exercise of the extraordinary powers vested in this court by § 33E. While those powers are to be exercised sparingly, they may, and perhaps must, be exercised when all other conventional tests and procedures have been exhausted but we are still left with a miscarriage which may result unless we exercise those powers to prevent it.

The judicial process cannot be expected to be understood or respected for convicting as a criminal, and then committing to prison for life, a person as to whom there may have been a miscarriage of justice in the determination of his

mental competence and criminal responsibility for his acts. It is on this basis that I would exercise our powers under § 33E to reverse the judgment in this case and grant the defendant a new trial.

2. *Murder committed with extreme atrocity or cruelty.* Since 1858, our statutes have identified three types of homicide which constitute murder in the first degree. St. 1858, c. 154, § 1. G. L. c. 265, § 1. They are "[m]urder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life." G. L. c. 265, § 1.

Whether the evidence of the manner and circumstances in which a homicide was committed is sufficient to submit the case to the jury on the issue whether it was committed "with extreme atrocity or cruelty" has been the subject of many decisions of this court. *Commonwealth* v. *Podlaski,* 377 Mass. 339, 348-349 (1979). *Commonwealth* v. *Clifford,* 374 Mass. 293, 307-308 (1978). *Commonwealth* v. *Reddick,* 372 Mass. 460, 462 (1977). *Commonwealth* v. *Lacy,* 371 Mass. 363, 367-368 (1976). *Commonwealth* v. *Satterfield,* 362 Mass. 78, 80-82 (1972). *Commonwealth* v. *Connolly,* 356 Mass. 617, 628-629, cert. denied, 400 U.S. 843 (1970). *Commonwealth* v. *McGarty,* 323 Mass. 435, 440 (1948). *Commonwealth* v. *Bartolini,* 299 Mass. 503, 516, cert. denied, 304 U.S. 565 (1938). *Commonwealth* v. *Knowlton,* 265 Mass. 382, 388-389 (1928). *Commonwealth* v. *Devlin,* 126 Mass. 253, 254-255 (1879). *Commonwealth* v. *Desmarteau,* 16 Gray 1, 9-11 (1860). The evidence in this case was sufficient to warrant the submission of the case to the jury on the question whether the murder was committed "with extreme atrocity or cruelty" as those words have heretofore been construed and applied in the cases cited above.

At all times since 1858, when the Legislature identified the three types of murder in the first degree in substantially the language now appearing in G. L. c. 265, § 1, this court has held that proof of murder committed "with extreme atrocity or cruelty" did not require proof that it was also

committed with "deliberately premeditated malice afore-
thought." This was first decided in *Commonwealth* v. *Des-
marteau, supra* at 9-10, where this court said: "The counsel
for the prisoner contended that to constitute a murder in the
first degree, by reason of its being committed with extreme
atrocity or cruelty, the atrocity and cruelty must be pre-
meditated. In the opinion of the court, this position cannot
be maintained. The three different cases stated as authoriz-
ing a conviction of murder in the first degree are so far in-
dependent, that the existence of either would authorize the
jury to return a verdict of murder in the first degree. The
statute has made extreme atrocity or cruelty in the commis-
sion of the murder sufficient to constitute the crime of
murder in the first degree; and if this be shown, it is not in-
cumbent on the government affirmatively to show that such
atrocity and cruelty were premeditated." Later, in *Com-
monwealth* v. *Gilbert,* 165 Mass. 45, 59 (1895), we said:
"[T]he [statutory] requirement of deliberate premeditation
clearly is not attached to murder committed with extreme
atrocity or cruelty . . . ." Again more recently, in *Com-.
monwealth* v. *Appleby,* 358 Mass. 407, 415 (1970), we said:
"It is not necessary, however, to show that such atrocity or
cruelty [with which a murder is committed] was premedi-
tated . . . ."

The opinion of the court in the present case introduces a
new element to the crime of murder committed "with ex-
treme atrocity or cruelty." The court first holds that the
evidence would permit the jury to find that the defendant is
criminally responsible within the rule adopted in the *Mc-
Houl* case, *supra,* but would also permit the jury to find that
the defendant has a reduced mental capacity. It then
argues for a consideration of the entire evidence, including
the "defendant's peculiar mental state as an additional fac-
tor to be weighed in determining whether the murder was
committed with extreme atrocity or cruelty." *Supra* at
685-686.

Finally, the court states that "[h]ereafter, in addition to
the traditional instructions on extreme atrocity or cruelty
the judge may also instruct the jurors that if they find from

the evidence that the defendant had substantially reduced mental capacity at the time the crime was committed, they may consider what effect, if any, the defendant's impaired capacity had on his ability to appreciate the consequences of his choices. Thus, the defendant's mental impairment is to be weighed in evaluating the evidence of the manner and means of inflicting death, the instrumentalities employed, any disproportion between the means actually needed to inflict death and those employed, the consciousness and degree of suffering of the victim, and the extent of the victim's physical injuries, factors customarily associated with extreme atrocity or cruelty." *Supra* at 686 n.16.

If the jury on retrial is instructed in accordance with the court's mandate as quoted above, the result will be the introduction of the doctrine of diminished capacity as a partial defense to the crime of murder in the first degree when committed with extreme atrocity or cruelty. This would mean that in a situation which would otherwise constitute murder in the first degree by reason of extreme atrocity or cruelty, the jury could find the defendant guilty of murder in the second degree solely by reason of his reduced mental capacity, notwithstanding the fact that by the proper application of the *McHoul* test the defendant meets all the requirements to make him criminally responsible for his conduct. With this I cannot and do not agree.

This is a judicial attempt to rewrite a legislative definition of what constitutes one of the three types of murder in the first degree. It will erode a legislative mandate which has passed judicial scrutiny in a number of decisions by this court since 1858. It opens the door for any defendant to escape the legislative mandate of a life sentence without benefit of parole for the crime of murder committed with extreme atrocity or cruelty by his resort to the simple device of raising a reasonable doubt whether he acted under the influence of drugs or intoxicating liquor in committing an alleged brutal or savage murder. Cf., e.g., *Commonwealth v. Podlaski,* 377 Mass. 339, 340-342, 348-349 (1979).

The determination of what the penalty, or the range of the penalty, should be for any given crime is primarily a matter of public policy for determination by the Legislature, within constitutional limits. There is no constitutional question raised in this case. There is no ambiguity in the pertinent language of G. L. c. 265, § 1, which governs this situation. The best authority which can be advanced for the latter statement is a review of relevant language from some decisions of this court over the last century.

Our decision in *Commonwealth* v. *Gilbert,* 165 Mass. 45 (1895), is frequently cited for the principle that a person may not be found guilty of murder committed with deliberately premeditated malice aforethought if, at the time of the murder, he was incapable, by reason of being intoxicated, of deliberately premeditating the homicide. However, the decision is equally important for what this court said, *id.* at 58-59, on the subject which we are now considering: "The question presented . . . is this: Assuming a killing with malice aforethought, which would be murder in the second degree, was it incumbent on the prosecution, in order to obtain a conviction of murder in the first degree on the ground of extreme atrocity or cruelty, to show that the prisoner had knowledge of the character of the act? This must mean, we think, knowledge that the act of killing was attended with extreme atrocity or cruelty.

". . . .

"We do not think this special knowledge of the character of the act is an element which enters into the statutory description of a murder committed with extreme atrocity or cruelty. The intelligence and mental capacity requisite for the commission of murder were found to exist. Knowledge that the crime was extremely atrocious or cruel is not required. If the prisoner was a responsible agent, the statute providing that murder committed with extreme atrocity or cruelty is murder in the first degree calls for no greater degree of knowledge than is required for a conviction of murder in the second degree. This is a separate and distinct ground from that of deliberately premeditated malice afore-

thought; the requirement of deliberate premeditation clearly is not attached to murder committed with extreme atrocity or cruelty; nor is any degree of purpose, intention, or knowledge, beyond what is involved in the commission of murder with malice aforethought. This of itself excludes an accidental homicide. A murder committed with malice aforethought may be found to have been committed with extreme atrocity or cruelty, even though the murderer did not know that his act was extremely atrocious or cruel."

In *Commonwealth* v. *Appleby,* 358 Mass. 407, 415 (1970), this court said: "It is not necessary . . . to show that such atrocity or cruelty [with which the murder was committed] was premeditated or that the defendant knew his conduct constituted extreme atrocity or cruelty."

In the very recent case of *Commonwealth* v. *Monsen,* 377 Mass. 245, 254 (1979), we said: "To import a mens rea requirement into the words 'extreme atrocity or cruelty' would be to blur the distinction between that form of murder in the first degree [murder committed with extreme atrocity or cruelty] and the premeditated variety. Rather, we think that the Legislature intended to exact [upon an accomplice] the greater punishment of the principal solely on the basis of the shocking, unnecessary, and often painful manner in which the death has been caused. Although the inference that the actor possesses a particularly brutal state of mind might be warranted by the objective circumstances of the killing, no such inference is necessary in order to convict" (footnote omitted).

In view of the long and unwavering commitment by this court to the construction of G. L. c. 265, § 1, in the manner indicated by the decisions in our cases cited above, I see no sound reason for attempting now, by judicial decision, to change the meaning of the legislative words of "[m]urder committed . . . with extreme atrocity or cruelty." Whether it is desirable to introduce any version of diminished capacity as a mitigating factor to this crime as now defined by the statute is a question of legislative policy which I believe we should leave to the Legislature.