USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2427

 EVERARD GENIUS,

 Petitioner, Appellant,

 v.

 PETER PEPE, JR.,

 Respondent, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Richard G. Stearns, U.S. District Judge]

 Before

 Torruella, Chief Judge,
 
 Aldrich, Senior Circuit Judge,
 
 and Boudin, Circuit Judge.
 
 

 Robert L. Sheketoff with whom Sheketoff & Homan was on brief
for petitioner.
 Gregory I. Massing, Assistant Attorney General, Criminal
Bureau, Appellate Division, with whom Scott Harshbarger, Attorney
General, was on brief for respondent.

July 1, 1998

 
 

 BOUDIN, Circuit Judge. This is an appeal by Everard
Genius from the district court's order denying Genius's petition
for a writ of habeas corpus. Everard was convicted of first degree
murder in state court in 1980 and is currently serving a life
sentence for that crime. Relying primarily on the well-reasoned
decision of the district court, we sustain the denial of the writ. 
However, in light of the unusual history of the case, we set forth
a brief summary of the facts and our reasons for affirmance.
 The facts, recounted in numerous opinions cited
hereafter, can be briefly stated. In 1979, Genius--who was married
at the time--stabbed to death his paramour, Lillie Mae Nesbitt. He
claimed that she had threatened him with a gun and that he recalled
nothing thereafter. He also claimed that he was compelled to
commit the murder by a voodoo curse that his wife had placed upon
him. There is no dispute that Genius did in fact kill Nesbitt; the
only issue is whether an insanity defense should have been pursued
more vigorously.
 Prior to the state court trial, Genius was examined by
Dr. Dennis Koson, a forensic psychiatrist employed by McLean
Hospital with responsibilities at Bridgewater State Hospital. 
Koson found Genius incompetent to stand trial due to "situational
depression of severe proportions" resulting from "incarceration in
the jail and the charges lodged against him." Genius was then
treated for approximately two months with antidepressant
medication. In May 1980, Koson examined Genius again and found the
depression had lifted and that Genius was competent; Koson found
"no evidence of psychosis" and opined that Genius was not insane at
the time of the murder. 
 At almost the same time but prior to Genius's trial, the
Massachusetts Supreme Judicial Court recognized a diminished
capacity "defense" to first degree murder charges. Commonwealth v.
Gould, 405 N.E.2d 927, 932-35 (Mass. 1980). Under Gould, even a
person who is not insane under Massachusetts law might still argue
that he did not have the capacity to form the specific intent
needed for a conviction of first degree murder, which in
Massachusetts requires premeditation or extreme cruelty or
atrocity. See Mass. Gen. Laws ch. 265, 1. Even without either
element, the defendant might still be found guilty of second degree
murder so long as the murder was intentional. 
 Genius's counsel, Reuben Dawkins, determined to build his
defense on the Gould case. At trial, he called Dr. Koson who
testified that while Genius was not insane at the time of the
murder, he was "extremely agitated to the point of losing touch with
the enormity of what he was doing." However, consistent with his
own prior opinion, Koson admitted that nothing suggested that Genius
was "mentally ill" at the time of the crime as required for insanity
under Massachusetts law. After several hours of deliberation, the
jurors asked for further instructions on extreme atrocity and after
several days of deliberation, returned a verdict of first degree
murder. Genius's conviction was affirmed on direct appeal. SeeCommonwealth v. Genius, 442 N.E.2d 1157 (Mass. 1982).
 Two years later, in 1984, Genius filed a pro se motion for
a new trial and in that connection was examined--although only years
later, in 1987--by another psychiatrist, Dr. Daniel Weiss. Weiss
said that Genius's belief in voodoo constituted a delusion that
deprived Genius of self-control and meant that he "could not be held
to be criminally responsible." In a supplemental opinion, Weiss
said that Genius's amnesia might indicate that he was suffering from
a mental illness or defect after the murder. Treating this as newly
discovered evidence, the state Superior Court judge granted Genius
a new trial and was promptly reversed by the Massachusetts Supreme
Judicial Court. See Commonwealth v. Genius, 524 N.E.2d 1349 (Mass.
1988). 
 Having exhausted state remedies, Genius then turned to the
federal district court to pursue his constitutional claim that
Dawkins had rendered ineffective assistance of counsel in the
original state court trial by failing to pursue adequately the
possibility of an insanity defense. Under the Sixth Amendment, made
applicable to the states through the Fourteenth Amendment, a
criminal defendant is entitled to a competent defense counsel,
although counsel's judgments in formulating the defense strategy are
entitled to substantial deference. See Strickland v. Washington,
466 U.S. 668, 689 (1984). In response to Genius's initial habeas
corpus petition, the state moved to dismiss on procedural grounds
only, arguing that Genius had waived his objection by failing
earlier to raise his constitutional claim. 
 In response, Judge Keeton dismissed the petition on the
merits, determining that Genius's allegations, even if true, did not 
show that Dawkins had rendered ineffective assistance of counsel. 
At the time of this decision, it appears that the state had not yet
made any effort to develop the record to show what other psychiatric
evaluations had been done. Thus, when Genius appealed from this
original denial of the petition, this court knew little more than
the facts already recounted above concerning the defense that
Dawkins had mounted at trial and the background of his decision. 
On that record, this court reversed the district court. See Geniusv. Pepe, 50 F.3d 60 (1st Cir. 1995).
 In a brief opinion, this court pointed out that although
Koson had rejected Genius's claim of mental disorder, Weiss had now
opined that Genius had been or could have been insane. Dawkins
might, under state law, have obtained an independent psychiatric
examination paid for by the Commonwealth, and the report would have
been privileged and unavailable to the Commonwealth. Mass. Gen.
Laws ch. 261, 27C(4), ch. 233 20B. Given that Genius had
admittedly been incompetent to stand trial for several months and
that insanity would offer a complete defense, this court said that
Dawkins had provided incompetent representation in failing to pursue
the insanity issue.
 As soon as the decision was rendered, the state filed a
petition for rehearing, pointing out that the record had not been
adequately developed to show the context in which Dawkins had made
his decision. This court then entered an order denying rehearing
but saying that the state was free to seek to offer additional
evidence in the district court. On remand, Judge Keeton recused
himself, and the matter was transferred to Judge Stearns who
proceeded to develop the record. After doing so, Judge Stearns
entered the order now under review, rejecting Genius's claim that
he had been incompetently represented and denying his petition for
the writ. This appeal followed.
 Judge Stearns's thirty-one page opinion makes clear that
Genius was in fact evaluated six times before trial. Two of the
reports have been lost, and neither side claims to know exactly what
they said, although there is some reason to believe that they did
not say that Genius was insane at the time of the murder. Of the
four reports that are in the record, prepared by three different
psychiatrists, none suggests that at the time of the crime Genius
had a mental disease or defect that might have afforded him an
insanity defense.
 Genius was first examined after his arraignment on July
16, 1979 by the court clinic psychiatrist, but that report is
missing. In December 1979, Genius was examined by Dr. Emil
Pawlowski, the Director of the Suffolk County Superior Court
Psychiatric Clinic, who found him competent to stand trial, stating
that he was "moderately depressed," but that "there was no
suggestion of psychosis or organic brain disorder." In the same
month, the court ordered another evaluation by the court clinic
psychiatrist, but this report is also missing.
 In February 1980, Dr. Koson examined Genius and found him
incompetent to stand trial, for reasons already recounted, and in
April 1980, Genius was again examined by Dr. Robert Fein, the Deputy
Medical Director at Bridgewater. Fein found Genius now competent
to stand trial. In May 1980, Koson examined Genius again and gave
the opinion already described that there was no evidence of
psychosis and that Genius was not insane at the time of the murder
but may have been overcome by passion and a loss of control.
 Judge Stearns also undertook a review of Dr. Weiss's
several full opinions, which had not been before this court at the
time of the original appeal. Judge Stearns concluded that Weiss's
opinions provided no legitimate basis for doubting Genius's sanity
at the time of the trial. Weiss's original report made no mention
of a mental disease or defect--an absolute precondition under
Massachusetts law for the insanity defense--and his subsequent
report equated a belief in voodoo with mental disorder on the ground
that it was an irrational belief. Judge Stearns pointed out that
this approach would render insane vast numbers of Americans
including, merely to pick an example, the millions who believe in
astrology.
 On this second appeal, Genius does not challenge the
district court's right to supplement the record, in accordance with
our order on rehearing, but does urge that even on this record the
district court erred in concluding that Dawkins had rendered
competent service. Genius repeats that it would have cost nothing
for Dawkins to have obtained the additional psychiatric report
provided under state law. Since Genius had been found temporarily
incompetent to stand trial and had at least some worrying symptoms
(for example, alleged amnesia), Genius argues that his defense
counsel had nothing to lose and everything to gain by seeking the
psychiatric examination that might have given some purchase for an
insanity defense.
 The argument is not frivolous, but neither is it
persuasive. In many criminal cases, there are (in the abstract)
numerous possible defenses. Even when there is no need for an
expert or the costs of an expert are borne by the state, pursuing
any line of inquiry involves some use of time and distracts in some
degree from other possible defenses that might be pursued. As the
Eleventh Circuit has said, "counsel . . . is not required to pursue
every path until it bears fruit or until all available hope
withers." Solomon v. Kemp, 735 F.2d 395, 402 (11th Cir. 1984),
cert. denied, 469 U.S. 1181 (1985) (citation omitted).
 In short, everything depends on context. Here, the
context is that Genius had been examined by three psychiatrists
whose reports are available to us and none of them suggested that
there was any indication of mental disease or defect at the time of
the crime. The only asserted expert evidence of Genius's insanity
at the time of the crime was prepared seven years afterwards;
without adopting the district court's description of Weiss's
analysis as "addled," we agree that it provides very little basis
even now for thinking that Genius had an insanity defense available. 
By contrast, Koson's testimony did supply some hope for the
diminished capacity defense, while an insanity defense would have
involved impeaching Koson's claim that Genius was not insane at the
time of the crime.
 Against this background, we have no hesitation in
concluding that on a fully developed record, there is no showing
that Dawkins provided incompetent defense. And in fairness to
Dawkins, it is worth recording that the state Superior Court judge
who granted the motion for a new trial on grounds of newly
discovered evidence also wrote: "I . . . find it hard to imagine
what else Mr. Dawkins could legitimately do in this type of case. 
He comported himself as a talented advocate. He did not fail to
protect his client at any time during the trial."
 Affirmed.