Everard GENIUS

v.

Peter PEPE, Jr.

No. CIV.A.93–CV–12113–RGS.

United States District Court, D. Massachusetts.

Nov. 13, 1997.

Robert L. Sheketoff, Sheketoff & Homan, Boston, MA, for Plaintiff.

Everard Genius, Norfolk, MA, pro se.

Gregory I. Massing, Attorney General's Office, Elisabeth J. Medvedow, Atty. General's Office, Criminal Bureau, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS

STEARNS, District Judge.

### INTRODUCTION

On July 18, 1980, Everard Genius was convicted of first degree murder and sentenced to life in prison for the killing of Lillie Mae Nesbitt. Nesbitt was stabbed to death in her home on May 29, 1979. Nesbitt's eighteen year old daughter, Bernell Nesbitt, witnessed the onslaught, and after a futile attempt to save her mother, ran next door for help. A neighbor, who saw Genius leaving Nesbitt's home, found Nesbitt lying in a pool of blood.

Genius is of Jamaican origin. He is an ardent believer in Voodoo, a polytheistic West Indian religion combining aspects of African cult worship with Catholic rite. Genius admitted to a long adulterous relationship with Nesbitt. Genius's wife Dolores was aware of his infidelity.[1] She and Nesbitt frequently complained to one another about Genius's behavior.

Genius testified that he visited Nesbitt on the morning of May 29, 1979, after returning from a trip to Canada. Nesbitt accused him

of an involvement with a third woman. She also complained that he was spending too much time with his wife. When Genius refused Nesbitt's request that he leave, she called police. Genius spoke calmly with the responding officers and left the house without incident.[2]

Genius testified that while he was visiting his wife, Nesbitt called to invite him back to her home.[3] Genius claimed that during a quarrel Nesbitt threatened him with a knife and gun. According to Genius, Nesbitt pointed the gun at him and pulled the trigger, but the gun misfired. Genius testified that he had no further recollection of the morning's events.[4] The medical examiner later determined that Nesbitt had been stabbed ten times, in among other places, the ear, face, neck, chest, abdomen, pelvis, back. and right hand. Genius blames his wife for casting a Voodoo spell on Nesbitt, inciting her attempt to kill him.

Genius's lawyer, Reuben Dawkins, offered two defenses at Genius's trial: (1) that Genius had acted in self defense in the sincere belief that Nesbitt intended to kill him; and (2) that Genius's mental state precluded him from forming the necessary intent to either premeditate Nesbitt's death or to act with extreme atrocity and cruelty. See *Commonwealth v. Gould,* 380 Mass. 672, 680–686, 405 N.E.2d 927 (1980). The jury returned a verdict of first degree murder.

On September 27, 1993, after exhausting his state court remedies, Genius brought a petition for habeas corpus in the district court, arguing that Dawkins, by failing to interpose a full insanity defense, had been ineffective in presenting his defense.

---

1. Dolores Genius divorced Genius prior to his trial.

2. Genius told the police that he had waited for them to arrive because he did not want Nesbitt "to say that I did anything, which I didn't." Trial Tr. at 312.

3. Dolores Genius testified that during the visit, Genius threatened to kill her with a knife. He relented only after she threatened to go to Dorchester District Court to renew an expired restraining order.

4. Two neighbors testified that Genius appeared calm when they observed him drive away from Nesbitt's home after the murder. A few minutes later, a Boston police officer, responding to a radio dispatch, signaled Genius to stop. Genius complied, but then ran from the car. The officer apprehended Genius after a foot chase. A later search of Nesbitt's home found a gun concealed in a closed bedroom dresser drawer.

On July 22, 1994, Judge Robert Keeton dismissed the petition finding, as did the Supreme Judicial Court on Genius's initial appeal, that Dawkins had rejected an insanity defense in order not to compromise Genius's more promising partial defense of diminished capacity.[5] Judge Keeton held that Dawkins had made a reasoned and reasonable tactical choice not to contradict Dr. Dennis F. Koson, the expert who testified to Genius's diminished mental state, by directly or indirectly impeaching Dr. Koson's concurrent determination that Genius was not so mentally impaired as to have been criminally insane at the time of the murder. Judge Keeton also ruled that there was no apparent "reason to allow the parties further discovery, to further expand the record, or to conduct an evidentiary hearing on the petition." Memorandum and Opinion of July 22, 1994, at 15.

On March 21, 1995, the First Circuit Court of Appeals reversed the district court and remanded the case. The First Circuit noted that Genius had found a psychiatrist willing to support his claim of insanity. The Court also faulted Dawkins for failing to "even explor[e] a possible complete defense [of lack of criminal responsibility] because offering it might weaken a partial one [of diminished mental capacity]...." *Genius v. Pepe*, 50 F.3d 60, 61 (1st Cir.1995). On April 4, 1995, the Commonwealth sought to expand the record before the Court of Appeals in anticipation of a rehearing en banc. On April 13, 1995, the First Circuit denied an en banc hearing. The Court also noted that the "motion to expand the record does not lie in this court. Upon remand the motion may be directed to the District Court, which will be free to make new findings, if appropriate." On April 21, 1995, the Court issued its mandate.

On June 8, 1995, the case was transferred to this session.[6] On August 18, 1995, the Commonwealth renewed its motion to expand the record to include a number of documents that had not been presented to either Judge Keeton or the Court of Appeals. These included the trial transcripts, the transcript of Genius's arraignment, the transcript of the 1987 hearing on Genius's motion for a new trial, Dr. Koson's two psychiatric evaluations, Genius's recently acquired psychiatric reports, a letter from Dr. Koson commenting on these reports, the report of an additional psychiatrist who evaluated Genius before his trial, and a letter from Dawkins. The court allowed the motion to expand the record and on December 15, 1995, invited the parties to designate any other materials that they wished the court to consider.

In response, the Commonwealth submitted an affidavit from Dawkins.[7] Genius requested that "the entire Superior Court file" be made part of the record. On January 24, 1996, the court accepted the Commonwealth's additional submissions and directed Genius to specify more particularly those portions of the state court file that he wished to include.[8] On February 6, 1996, the Commonwealth sought leave to submit a newly discovered report from yet a third psychiatrist who examined Genius seven months before his trial. The court allowed the Commonwealth's motion.

---

**5.** The Supreme Judicial Court had decided *Commonwealth v. Gould*, the case on which Dawkins formulated the diminished capacity defense, barely six weeks prior to Genius's trial.

**6.** After the Court of Appeals remanded the case, Judge Keeton "direct[ed] that th[e] case be returned to the Clerk for reassignment to another judge of this court."

**7.** Genius opposed the inclusion of the Dawkins affidavit, arguing that he should at least be allowed to depose Dawkins and Dr. Koson because "[t]here is every reason to question the correctness of the [Dawkins] affidavit" given that there are "two published decisions concerning Mr. Dawkins' conduct in the practice of law." Ge-

nius gave no other explanation for seeking leave to take these depositions, nor did he thereafter seek to file a counter-affidavit. The court has read both of the disciplinary decisions Genius alluded to as well as a third decision. See In *the Matter of Dawkins*, 3 Mass. Att'y Dis. R. 52, 53 (1983), In *the Matter of Dawkins*, 412 Mass. 90, 587 N.E.2d 761 (1992), and In *the Matter of Dawkins*, 10 Mass. Att'y Dis. R. 49 (1994). Because the court has not found it necessary to rely on the Dawkins affidavit and has instead relied on the transcript of the trial and the trial judge's appraisal of Dawkins' performance, there is no reason to allow the additional discovery.

**8.** Genius did not comply with the court's January 24, 1996 Order.

On February 15, 1996, the Commonwealth filed a motion to dismiss Genius's petition, arguing that the expanded record conclusively established that Dawkins had reasonably investigated the possibility of presenting an insanity defense. On May 17, 1996, Genius opposed the motion to dismiss.[9] On November 6, 1996, a hearing was held on the motion.[10]

### PRIOR PROCEEDINGS

From July 7 to July 18, 1980, Genius stood trial in Suffolk Superior Court for Nesbitt's murder. Justice Peter F. Brady presided. In support of Genius's claim of diminished capacity, Dawkins called Dr. Dennis Koson, a court appointed psychiatrist who had found Genius competent to stand trial. Dr. Koson testified that at the time of Nesbitt's murder, Genius "was responding out of panic and especially out of fear and out of some anger at this woman and simply lost control." Trial Tr. at 422–423. While Dr. Koson opined that Genius was not "frankly mentally ill," he also testified that Genius was "a pretty passive kind of man who controlled his anger very much" and "has no history of violent action." Trial Tr. at 417, 416, and 424. When asked if he had "an opinion as to whether [Genius] had the ability to premeditate, to calculate and plan the crime of May 29, 1979?," Dr. Koson testified that in his

> view of the—let me call it—situation with this victim ... there was increasing turmoil or anger and a precipitous or a sudden blowing up or loss of control on the defendant's part. At that time I think his state of mind was not consistent with the ability to calculate or understand the consequences of what he was doing. I think he was too agitated and in too much turmoil in that his behavior had literally taken him over at that time.

Trial Tr. at 439–440.

Dr. Koson also testified as to Genius's capacity to perceive the cruelty and atrocity of his acts.

These kinds of terms are more or less foreign to psychiatrists. They are in many respects value judgments.... Genius ... had lost control of his behavior, and exactly what the consequences of the behavior were lost to him. I don't think he was aware of those things at the time. I think that he was not taking into account the consequences of what he was doing, what it would mean to him, what it meant to the victim. I don't think he had that capacity at the time he was stabbing her, and I think that's a fairly customary part of human nature when one has lost control.

Trial Tr. at 441–442.

Justice Brady instructed the jury in relevant part as follows:

> So murder in the second degree, then, is an unlawful killing with the same malice aforethought that I have been talking about, but without deliberate premeditation in this case or without extreme atrocity and cruelty.

> I have told you that deliberately premeditated malice aforethought places a murder in the category of first degree, so we have to define the phrase "deliberately premeditated." These words imply that an action is meditated upon beforehand sufficiently long to form a clear intent to kill and the purpose to carry out that intent. The law does not set a fixed period of time required to meditate deliberately. It does not mean that meditation must be slow. It does not mean that the intention has to be formed slowly. On the other hand, it does exclude action which is taken so quickly that there is no time to think about the action and then determination to do it.

> To prove deliberate premeditation, the Commonwealth must show that the defendant's resolution to kill was a result of reflection, which is not so much a matter of time as a matter of logical sequence: First, the deliberation and premeditation, then the resolution to kill, and, lastly, the killing

9. On April 12, 1996, the court had allowed the motion to dismiss, on grounds that it was unopposed. On April 17, 1996, Genius's counsel filed a motion to reconsider explaining that his failure to file a timely opposition was due to an innocent oversight. On May 3, 1996, the court allowed the motion to reconsider and gave Genius twenty-one days to file an opposition.

10. The hearing was rescheduled from an earlier date at the Commonwealth's request.

in pursuance of the resolution must be proved beyond a reasonable doubt by the Commonwealth.

All of that may occur in a few seconds, however. It merely requires that time to form a clear intent. To make a determination as to deliberate premeditation, it is necessary to determine what a person's state of mind is; and, in determining what that state of mind is, it is permissible to make reasonable inferences from the facts and circumstances surrounding the killing so long as it is established beyond a reasonable doubt that the acts of the killer resulted from deliberate premeditated malice aforethought.

If you find—and now I am talking about that one area that I have told you about in relation to first degree murder, that is, deliberate premeditation—if you find that the defendant had a mental illness—and I stress those words—if you find that the defendant had a mental illness, then you may consider that on the issue of deliberate premeditation. If you are satisfied upon the evidence that the defendant killed the deceased but that he was incapable of conceiving a deliberately premeditated intention to kill because he was suffering from a mental illness, then he is not guilty of murder in the first degree on the theory of deliberate premeditation.

The burden is on the Commonwealth to satisfy you beyond a reasonable doubt that the defendant was capable of deliberately premeditating in order to find him guilty of murder in the first degree on the theory of deliberate premeditation.

The psychiatric testimony in this case may be considered by you to distinguish between intent in the sense of conscious desire, planning in the sense of considering the mechanical feasibility of effectuating that desire, and premeditation in the sense of critically evaluating the pros and cons of proceeding to effectuate the desire, thereby explaining in understandable terms how a defendant could logically entertain an intent, plan the effectuation of that intent. but not deliberately premeditate regarding the objective of that intent. . . .

To support a finding of guilty of murder in the first degree on each indictment, you would have to find beyond a reasonable doubt that the victim was killed, that the victim was killed by the defendant, that the defendant caused the death with malice aforethought, and that there was deliberate premeditation and a specific intent to kill on the part of the defendant. Those are the essential elements of the charge of murder in the first degree, based on the theory of the government as to that portion requiring deliberate premeditation.

The government has also proceeded, as I have previously mentioned to you, on another theory in relation to first degree, and that is murder committed with extreme atrocity and cruelty. And, if you remember, that is one of the two theories I mentioned that are encompassed by first-degree murder.

In order to find the defendant guilty of this crime, the Commonwealth must prove beyond a reasonable doubt—and that is under the theory of atrocity—(1) the act of an unlawful killing, and the jury must also find (2) that the method of causing death surpassed the cruelty inherent in the taking of a life. The awareness and length of suffering of the victim, the use of extraordinary force or repetition of blows, the choice of weapon, and the extent of injury all can be considered by the jury as evidence of extreme atrocity. Extreme atrocity is not limited to cases with such evidence, however. The jury as a representative of the conscience of the community should determine the incident of extreme atrocity and cruelty.

If you find from the evidence that the defendant had substantially reduced mental capacity at the time the crime was committed, you may consider what effect, if any, the defendant's impaired capacity had on his ability to appreciate the consequence of his choices. The defendant's mental impairment, if you so find, is to be weighed in evaluating the evidence of the manner and means of inflicting death. The instrumentalities employed, any disproportion between the means actually needed to inflict death and those employed, the consciousness and degree of

suffering of the victim, and the extent of the victim's physical injuries are factors that are customarily associated with extreme atrocity and cruelty.

Trial Tr. at 501–505.

The jury, after three hours of deliberation, asked two questions: (1) "Define ... 'extreme atrocity'"; and (2) "What is the correct verdict if the murder was committed with extreme atrocity, but the defendant was suffering from some pressing mental condition (but not a mental illness)?" Justice Brady repeated his instructions on extreme atrocity and cruelty, and reminded the jury that a verdict of murder in the second degree would be warranted if the evidence established the requisite degree of mental impairment. After deliberating for another two and one-half days, the jury returned a verdict of first degree murder.

Genius appealed the conviction arguing ineffective assistance of counsel in light of Dawkins' failure to raise an insanity defense. The Supreme Judicial Court, in *Commonwealth v. Genius I*, 387 Mass. 695, 442 N.E.2d 1157 (1982), affirmed the conviction, noting that Dawkins had relied on a claim of diminished capacity in an unsuccessful effort to avoid a verdict of first degree murder.[11] The Supreme Judicial Court held that Dawkins' decision was

> a reasonable tactical choice considering that defendant's own expert testified that the defendant was criminally responsible [at the time of the killing]. To argue against his own witness on the issue of criminal responsibility could well have undercut his expert's credibility on the *Gould* issues. In the circumstances, we find no ineffective assistance of counsel in counsel's failure to argue lack of criminal responsibility.

*Id.* at 697, 442 N.E.2d 1157.

The Supreme Judicial Court also observed that an insanity instruction, had it been re-

quested, would have been warranted. The Court nonetheless held that there was no risk of a miscarriage of justice in light of the improbability that the jury would have found Genius lacking in criminal responsibility when, after asking the appropriate questions, it had rejected his lesser defense of diminished capacity. *Id.*, at 699, 442 N.E.2d 1157.

On October 5, 1984, Genius filed a pro se motion for a new trial. On November 9, 1985, Genius sought public funds to conduct a "psychiatric examination and an evaluation of [his] criminal responsibility on the date of the offense." See *Commonwealth v. Genius II*, 402 Mass. 711, 712, 524 N.E.2d 1349 (1988).[12] After a hearing, Justice Brady, on November 21, 1985, denied the motion for funds. On November 27, 1985, Genius appealed the denial. On January 8, 1986, Justice Brady appointed counsel to represent Genius. On January 10, 1986, a Single Justice of the Massachusetts Appeals Court authorized the expenditure of $500 to conduct a psychiatric evaluation. Genius hired Dr. Daniel Weiss. After interviewing Genius and reviewing some unspecified medical records, Dr. Weiss opined that Genius lacked criminal responsibility at the time of the crime.

Armed with Dr. Weiss's report, Genius filed a second motion for a new trial. Genius argued that Justice Brady had garbled the definition of malice in his jury instructions and renewed the claim that Dawkins had performed ineffectively. Genius attributed three errors to Dawkins: (1) that he had failed to inform Genius of an offer of a plea to second degree murder; (2) that he had begun trial preparations only two days before the trial was scheduled to begin; and (3) that he had failed to request an insanity instruction. On June 17, 1987, Genius testified at a hearing on the motion.

On July 7, 1987, Justice Brady allowed Genius's motion for a new trial. In a written opinion,[13] Justice Brady found that no offer

---

**11.** At the time of Genius's trial, Massachusetts allowed for the death penalty in first degree murder cases. See Memorandum and Opinion of July 22, 1994 (Keeton, J.), at 25.

**12.** The parties failed to submit to the court the docket entries memorializing the procedural history surrounding the motion for a new trial. The

parties have, however, submitted the state court appellate briefs recounting the relevant events.

**13.** The parties have provided the court with a copy of Justice Brady's opinion which has been incorporated into the record.

of a plea to second degree murder had ever been extended by the Commonwealth. He also held that there was no error in his instruction on malice. As to Dawkins's allegedly belated preparation for trial, Justice Brady commented as follows.

The defendant also alleges that Mr. Dawkins did not begin to prepare the defense until two days before trial, and did not discuss the ramifications of the case until that time. I find this allegation to be untrue. I have recently reviewed the entire transcript and find it hard to imagine what else Mr. Dawkins could legitimately do in this type of case. He comported himself as a talented advocate. He did not fail to protect his client at any time during the trial. I believe the contents of Mr. Dawkins' letter to [the District Attorney] dated June 5, 1987, as to the contents of the discussions [he had prior to trial] with the defendant.

Justice Brady, however allowed the motion stating that

[t]he only issue that has caused me deep concern is the failure of a request for an "insanity" instruction. I believe and find that this defense was not available to the defense at trial and thus the request was not reasonably available to the defense. However, in this case, our Supreme Judicial Court has found that there was sufficient evidence during the trial to require an instruction on criminal responsibility, if requested. Added to this is a psychiatric report that the defendant was not criminally responsible. I am deeply concerned about this area of insanity but I do not feel that attorney's actions were such that he should have to bear the blame on this issue. As in *Commonwealth v. Cosme,* 398 Mass. 1008, 499 N.E.2d 1203 (1986), I feel that there is a sufficient question concerning the defendant's mental condition and the defendant should be allowed an opportunity to produce evidence supporting his claim.

The Commonwealth appealed. On June 30, 1988, the Supreme Judicial Court vacated Justice Brady's order and reinstated Genius's conviction. See *Genius II,* supra. The Supreme Judicial Court pointed out the inconsistency in Justice Brady's reasoning.

The motion judge reviewed both of the defendant's allegations and concluded that they were groundless. The judge, nonetheless, granted the defendant a new trial.

After examining the judge's memorandum in which he allowed the defendant's motion, we conclude that the judge granted the new trial on the basis of Dr. Weiss's reports that the defendant was not criminally responsible on the date of the offense. While the judge did not make an explicit finding to this effect, it appears that he viewed the psychiatric reports as newly discovered evidence.

While it is true that the granting of a new trial is within the discretion of the judge, ... that discretion is not boundless and absolute.... Here, the judge addressed and rejected both of the grounds proffered by the defendant in support of his motion. The judge then allowed a new trial without questioning, or making necessary findings, whether the information contained within the psychiatric report was unknown to the defendant or to his counsel at trial and not reasonably discoverable, ... and whether the information was of such relevance and materiality that it created a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial....

*Genius II,* at 714, 524 N.E.2d 1349 (citations omitted).

The Court went on to hold that the Weiss reports could not be deemed "newly discovered" because the facts on which Dr. Weiss based his opinion were known or readily discoverable at the time of the trial.

To conclude, we are presented with a situation where the judge expressly excluded the two grounds offered by the defendant in support of his motion, and improperly applied a third not advanced by the defendant in allowing a new trial. While a judge has substantial latitude in determining whether to order a new trial, he must do so on some identifiable ground. We therefore conclude that, in the circumstances of this case, the judge erred and

we thereby vacate the judge's order granting the defendant's motion for a new trial. *Genius II*, at 714–715, 524 N.E.2d 1349.

On September 27, 1993, Genius brought this habeas corpus petition citing three errors in the state proceedings: (1) Dawkins' failure to raise an insanity defense; (2) the trial court's reference to Dr. Koson as an "expert for the defense;" and (3) Dawkins' failure to communicate the alleged offer of a plea. On July 22, 1994, Judge Keeton granted the Commonwealth's motion to dismiss. With regard to the insanity issue, Judge Keeton, as earlier observed, adopted the Supreme Judicial Court's reasoning in *Genius I*, agreeing that Dawkins had made an acceptable tactical choice to pursue a diminished capacity defense in order to avoid undermining Dr. Koson's credibility.

On March 21, 1995, Judge Aldrich issued the panel's opinion reversing Judge Keeton.[14] The opinion is relatively brief and can be quoted in major part.

> Genius ... now appeals from a district court order, backed by an extensive opinion, denying his petition for habeas corpus. The facts are fully set forth by the Massachusetts Court and, again, by the district court. We deal with only one contention, that the district court erred in rejecting defendant's claim that he was denied effective assistance of counsel in that counsel did not pursue the defense of lack of criminal responsibility (insanity). We reverse. Turning to the merits of the original case, in Doctor Koson's opinion defendant was not insane, and did not have a mental defect, but his mentality was sufficiently diminished at the time as to detract, if the jury saw fit, from the extreme atrocity that would make for first degree murder in the absence of proof of premeditation. Defendant says he had nothing to lose by having an insanity examination. Admittedly, the Commonwealth would have been required to pay for it, M.G.L. c. 261, § 27C(4), and the report would have been privileged and unavailable to it. M.G.L. c. 233, § 20B. If the report proved affirmative, defendant

> was ahead. If it proved negative, he need not use it.

> The district court responded to this with the generalization that preparation is always in the discretion of counsel, who cannot be faulted for not going on and on, unless there was an indication that there might be a benefit. But there may have been one. Cf. *Profitt v. Waldron*, 831 F.2d 1245 (5th Cir.1987). In *Profitt* the court held counsel incompetent for ignoring the fact that defendant had been in a mental institution. Here defendant did not have that history, but he did have something of consequence. To meet the fear that he was not competent to stand trial, defendant had been sent to Bridgewater and the fear was confirmed on February 20. It was not until May that competency was found. While incompetency to stand trial is not equivalent to insanity, it is a serious condition, that should have flagged the possibility. Where insanity would have been a complete defense, it was inexcusable not to pursue it.

> Unless, of course, there was a reason. In *Genius I*, [the Supreme Judicial Court] said,

>> We conclude that this was a reasonable tactical choice considering that defendant's own expert testified that the defendant was criminally responsible on May 29, 1979. To argue against his own witness on the issue of criminal responsibility would well have undercut his expert's credibility on the *Gould* issues. In the circumstances we find no ineffective assistance of counsel in counsel's failure to argue lack of criminal responsibility. 387 Mass. at 697, 442 N.E.2d 1157.

> We disagree. To forego even exploring a possible complete defense because offering it might weaken a partial one (reducing murder one to murder two) seems an extraordinarily unbalanced choice. Whether counsel made it deliberately (as to which there was no evidence) or by default, we cannot find it within the most tolerant

---

**14.** The First Circuit did not address the second or third grounds of Genius's petition, both of which were rejected by Judge Keeton. Genius has not pressed either of these latter grounds on remand, only the first, the failure to present an insanity defense.

standard of competence. And particularly so when there already was some evidence of insanity in the record. *Genius I,* 387 Mass. at 697, 442 N.E.2d 1157.

As to prejudice from counsel's neglect, we have but to look at the statement of the Superior Court judge (the same one who had tried the case) that he was granting a new trial because the report of Doctor Weiss gave him "deep concern."

*Genius v. Pepe,* 50 F.3d at 60–61.

### FACTS

The following undisputed facts are drawn from the expanded record. In July of 1979, Genius privately retained Dawkins to represent him.[15] On July 16, 1979, Genius was arraigned for murder in Suffolk Superior Court. A not guilty plea was entered. With Dawkins' concurrence, the court ordered that Genius be examined by a court psychiatrist to determine his competency and criminal responsibility. The results of that examination, however, are not reflected in the record.

On October 18, 1979, the court ordered that Genius be examined by the Director of the Suffolk Superior Court Psychiatric Clinic, Dr. Emil J. Pawlowski.[16] Dr. Pawlowski submitted his report on December 3, 1979. Dr. Pawlowski found that

[Genius] was quite anxious, but alert, cooperative and responsive. He cried during some of the interview and stated that he has been afflicted with headaches and depression since his arrest several months ago. He was able to relate a detailed, chronological, and logical history.

The patient understood the nature of the legal proceedings against him, his relationship to the proceedings, and the possible consequences if he were found guilty. Also, he understood the principles and the functions of the courtroom. He seemed capable of assisting his attorney in his defense.

Although moderately depressed, there was no suggestion of psychosis or organic brain

disorders. In my opinion, he is competent to stand trial.

Dr. Pawlowski did not offer an opinion on the issue of criminal responsibility. On December 14, 1979, the court ordered a second examination by a court psychiatrist. There is again no indication of the results in the record. On January 18, 1980, after a hearing in which Dawkins participated, Genius was committed to Bridgewater State Hospital for a twenty day period of observation "to ascertain [his] competency to stand trial and [his] criminal responsibility."

Genius was examined at Bridgewater by Dr. Koson on February 4 and 11, 1980. On February 14, 1980, Dr. Koson reported that he had found Genius to be

alert, well oriented to place, but was unsure of the year. He was extremely polite to the point of being [o]bsequious.... His emotional expressions were very flat and truncated and somewhat apathetic. His mood was consistently depressed and he frequently cried during the interview period.

Dr. Koson noted that Genius complained of hearing voices at night. Dr. Koson also found that Genius was suffering from headaches and loss of appetite, and that he was disoriented and unable to remember his own history. "While these findings were inconsistent with his clinical condition and suggested that he was severely disturbed organically or physiologically, on the second interview after [Genius] had been taking antipsychotic medications for several weeks, [he] was much more cooperative in terms of what he was able to remember of his history."

Dr. Koson concluded that Genius was

felt to be mentally ill and to be suffering from situational depression of severe proportions. This illness arose in and as a consequence of incarceration in the jail and the charges lodged against him. While much of his claim of amnesia is not consistent with his condition, profound depres-

---

**15.** On July 7, 1980, at the start of the trial, Dawkins was appointed by the Superior Court to represent Genius because Genius could no longer afford to pay him.

**16.** The court on October 11, 1979, had ordered that Dr. Kenneth Bryant, a Department of Mental Health psychiatrist, examine Genius. The docket does not explain why Dr. Pawlowski was substituted.

sion does result in repression or blocking of many emotionally laden and psychologically significant events, which the defendant is currently unable to discuss with this examiner or with an attorney.

Because Genius was unable "to communicate rationally with his attorney in the implementation of a defense," Dr. Koson recommended that Genius be found incompetent and committed to Bridgewater. Finally, Dr. Koson stated that because Genius's mental condition made it impossible to definitely determine his criminal responsibility, he should be examined again once his condition had improved.

On February 20, 1980, the court received a copy of Dr. Koson's report. On March 8, 1980, the court approved a petition to commit Genius to Bridgewater. On April 30, 1980, the Deputy Medical Director at Bridgewater, Dr. Robert A. Fein, examined Genius. On May 7, 1980. Dr. Fein's report was filed with the court. Dr. Fein concluded that Genius's condition had improved. He noted that Genius could identify the functions of the judge, the jury and the prosecutor, and "indicated that the defense attorney was there to aid him and could correctly identify the name of his attorney." Genius also "indicated that he had met with his attorney on several occasions in the Charles Street Jail and had told the attorney what he remembered." Dr. Fein found that Genius was "able to talk quite clearly and coherently," although he did cry towards the end of the interview. Dr. Fein found that Genius was not experiencing hallucinations and did not have "a delusional system." Dr. Fein noted that while Genius has

> indicate[d] that he has been able to talk with his attorney and ... feels his attorney is working for him, ... he continues to insist that he does not remember what happened. We have not been able to ascertain how much of the patient's inability to recollect what may have occurred is due to a true amnesia, due to a psychological repression of what might be an extraordinarily painful memory, due to willful choosing not to talk about what he remembers, or to another possibility.

In conclusion, Dr. Fein determined that Genius was competent to stand trial, but recommended that he remain at Bridgewater pending Dr. Koson's examination for criminal responsibility.

On May 8, 1980, Dr. Koson again examined Genius and found him "much more relaxed and without any evidence of a disturbance of thought process or content.... There was no longer a disturbance of memory function and he was able to recount the circumstances surrounding the alleged offense." He "remains mildly depressed which is appropriate to his circumstances and without any evidence of psychosis." Dr. Koson noted that while Genius was "without significant psychiatric history," he had "described increasing depression and headaches" prior to Nesbitt's death because of the "difficulties between him, his wife, and his girlfriend."

Dr. Koson reported that Genius was not sleeping well, his appetite was poor, and that "he was hearing voices of people calling him or the voices of women nagging him, especially his wife's voice." Dr. Koson noted, however, that the voices

> appear to be thoughts or ruminations rather than hallucinations. He did, however, report that he had heard voices since he was a child when he had a history of seizures following a severe typhoid fever and convulsions presumably stemming from that fever. The voices he described since childhood involved people calling him. He had gone to doctors for it but was never helped. He denied hearing or being influenced by voices the day of the alleged offense.

Dr. Koson then discussed the role that Genius's belief in Voodoo played in his actions and demeanor on the day of the murder.

> In addition to the increasing situational depression and tension headaches he was experiencing, he also indicated that his wife had gone to Jamaica to consult a voodoo witch doctor in order to bring back certain things which might cast a spell on the defendant and alter his behavior.... He in turn consulted a Haitian woman to discuss the spell his wife might have put on him. He was told to bring a picture of his wife and the Haitian woman did certain things to the picture ... and told him that as long as he carried it, he would be pro-

tected from the spell that his wife had gotten from the witch doctor. He generally kept the picture in his work boots, but on his return from Canada the morning of the homicide he had changed his boots and was without his protection. He indicates that but for this forgetting, he would have been protected and would likely not have done what he apparently did to the victim. He indicates that it was not like him at all, that he loved her very much, and was a very non-violent man and ascribed his activities to the voodoo spell.

Dr. Koson found that

[t]he defendant appeared to have been suffering from mild situational depression in connection with his difficulties with the women in his life. He does not appear to have ever experienced a major mental illness. In my opinion, he was not suffering from any mental illness at the time of the alleged offense upon which a defense of insanity might be predicated. He was not hearing voices at the time of the alleged offense nor was he experiencing delusional thinking. The voices he had heard at prior times in his life are culturally determined ways of dealing with stress, rather than being the product of mental illness. His concepts of voodoo and evil spells are similarly culturally determined and an earnestly held belief by large sectors of the world's population. Thus, they are not delusional or psychotic beliefs and more specifically, the defendant at the time of the alleged offense believed that he was protected and not influenced by any evil spell. He did not know until subsequently that the picture of his wife which was protecting him was not in his possession. He indicates that his wife subsequently in a search of his apartment reclaimed the picture. While he was extremely agitated and depressed at the time of the offense, he was in command of his faculties and by his statement very well aware of the reality of the situation and was responding

appropriately to his perceptions of the danger that he was in. He perceives himself as having acted in self-defense which is not an irrational view of his situation. In other words, he may have been mistaken in his perception, but not on an irrational basis.

In summary, it is my opinion that the defendant was not suffering from any major mental illness at the time of the alleged offense and did not lack the substantial capacity to appreciate the wrongfulness of his behavior or conform his conduct to the requirements of the law. He was in a great deal of emotional turmoil however and probably lost control suddenly out of panic, fear, and anger.

In closing, Dr. Koson concurred with Dr. Fein's opinion that Genius was competent to stand trial and recommended that "be adjudicated criminally responsible for his act, as there is no mental illness on which a defense of insanity might be predicated." On May 13, 1980, the court received a copy of Dr. Koson's second report.

On July 7, 1980, the jury in Genius's trial was empaneled. During the trial, Dawkins called Dr. Koson to testify to Genius's mental state at the time of the murder. Dr. Koson reiterated his opinion that while Genius was criminally responsible, his diminished capacity would have made it impossible for him to have formed the intent necessary to premeditate murder or to have acted with extreme atrocity and cruelty. On July 15, 1980, the jury began its deliberations. On July 18, 1980, the jury, after asking the questions previously described, returned a verdict of first degree murder.

After Genius's motion for a new psychiatric evaluation was allowed in 1986, Genius hired Dr. Daniel Weiss. Dr. Weiss met with Genius on May 20, 1986, and obtained a medical history. He issued his report on June 26, 1986.[17] Dr. Weiss related Genius's

---

17. Dr. Weiss stated that he "visited with [Genius] in a very extended meeting and we met on 20 May 1986 at ... Bridgewater, Massachusetts. He gives a very interesting history and it appears that he was convicted of having murdered his own girl friend and that this event took place on 29 May 1979 and that he has been in jail ever since the conviction. However, his attorney has recently been able to reopen the case, having followed certain legal procedures and it is my understanding that the original verdict may have been set aside and that a new trial may be offered to him. This in itself is most unusual, but it appears that he will have a new trial."

account of the events leading up to Nesbitt's death. Genius stated that it was about the time he met Nesbitt that

> [h]e and his wife began to have greater arguments and she got a restraining order against him and he rented a room ... in Dorchester.... At any rate his wife forced him out of the house and be became extremely friendly with Mrs. Nesbitt and took a trip to Jamaica with her and things began to calm down for him until eventually he obtained a divorce, but in the meantime things began to take on a different pattern and one has to understand the thinking of the natives in Jamaica because he claimed that at that time his wife in fact also went to Jamaica, but not with him, and that she took with her certain pictures of him and of Mrs. Nesbitt and that she went to seek the services of a Voodoo doctor there and that she, therefore, was able to develop certain charms. When she returned he suspected what she had done and he himself found a Voodoo doctor in Roxbury who told him to watch out, that his wife had very serious evil designs upon him and his welfare and this doctor then told him about certain charms on his own side which would immediately counteract the evil spirits which his wife was forcing upon him. He had to keep a picture in his boot for protection at all times and to keep it near his boot when he went to sleep and, of course, took his boots or shoes off.

Dr. Weiss then recounted Genius's recollections of the day of Nesbitt's death.

> On 29 May 1979 [Genius] returned from a trip to Canada and Mrs. Nesbitt claimed and his wife also claimed that he had taken yet another girl with him to Canada for an easy vacation and when he returned he went to see Mrs. Nesbitt. He believed when he went up to her house that he heard a gun clicking and certain signs told him that the magic was not working and that his wife's Voodoo was very strong and that it meant that to him his wife's magic was forcing a situation in which he and Mrs. Nesbitt would actually kill each other and that the wife would then be free from him forever. As a result some kind of scuffle ensued and the police were called. He did not tell me about the police being

called and that they told him to get out of there because beginning at about that time everything was confused in his own mind. It does appear, however, that he did leave the premises, but then came back a short time later and it was on the second visit that evidence showed that he stabbed Mrs. Lillie Nesbitt and that she died from this attack. He could not remember anything about it and asked me in all seriousness why he should kill her when in fact she was the one whom he was very friendly with and whom he loved. He believed only that it was the work of the Voodoo doctor which had forced this issue somehow.

Dr. Weiss stated that he had considered Dr. Koson's opinions but could not agree because "Dr. Koson had no history in his presentation of any of the Voodoo mysterious history which the patient gave to me." In coming to a determination as to Genius's criminal responsibility, Dr. Weiss stated that "[t]he question, of course, is whether this man was acting in full control of himself during this instance or whether in fact he was not responsible for his actions. Naturally this examination which I conducted is some seven years after the event and, therefore, I have only to go by my clinical judgment and by the records in my attempts to put everything together so that I might make a valid value judgement concerning this man."

Dr. Weiss opined that Genius's belief in Voodoo inspired the delusion that he had to kill Nesbitt before she killed him and that "from that point onward he really was out of control and could not be held to be criminally responsible." Dr. Weiss explained that

> [Genius's] behavior prior to the incident certainly is consistent with a person who believed in Voodoo magic and once again we have to assume that this man was trying to be truthful with me. He believed fully, in my opinion, that his wife had taken out a Voodoo curse against [him] and having knowledge of other people who have been in similar circumstances, there is a total belief that modern psychiatry finds it impossible to turn and to refute in those who believe. Accordingly he consulted his

own Voodoo doctor who gave him a way to counteract this, but the picture had to be in his boot at all times. He could not remember whether the picture was in his boot on the day in question, but he heard certain things [which] indicated to him that he must kill his girl friend and that she is destined to kill him at the same time and it is my belief that from that point onward he really was out of control and could not be held to be criminally responsible. Certainly Dr. Fein in his review almost a year later indicated that there was an amnesia for the entire event. He calls it an amnesia that this man even then and after having been under treatment for months was not able to recall the events of that day. Voodoo is, of course, an extremely powerful agent and belief for those who believe in it and there have been numerous articles in medical and psychological literature to indicate that very strange things happen during Voodoo trances in those who believe. It is not without reason that this man was acting, but mechanically, and out of a terrible fright of death himself and was not able to control himself and was not able to conform his actions to the needs and rules of society and could not control himself at the time.

I believe, therefore, that at that moment and at that time he was not competent and was not criminally responsible.

On May 28, 1987, Dr. Koson, at the Commonwealth's request, commented on Dr. Weiss' report. Dr. Koson pointed out that he had taken Genius's belief in Voodoo into account in his evaluation, but had found it irrelevant because of Genius's insistence that he did not know whether the Voodoo charm was in his boot or not on the day of Nesbitt's death.

If you believe or [ac]cept the fact that he believed in voodoo then you must believe that he felt he was protected at the time he visited first his wife and then his girlfriend for the second time.

In any event, I could not quite follow the logic of Dr. Weiss' reasoning. While I would certainly agree that a belief in voodoo is consis[t]ent with the widespread cultural beliefs of many people, it follows that in psychiatry belief in such is not per se evidence of mental illness anymore than other kinds of religious thinking *when such thinking is shared by a large cultural subset.* Consequently, if Mr. Genius believed in a kind of predestiny or fate ordained by his religious beliefs, such beliefs are not to be construed as delusional beliefs, they are in fact by definition rational. (Emphasis in original.)

More fundamentally, Dr. Koson observed that Dr. Weiss "appears to equate being out of control with lack of [criminal] responsibility," without any regard for the legal predicate of a finding of criminal insanity; the existence of a mental disease or defect.[18]

Dr. Weiss responded with a supplemental report on June 19, 1987. Dr. Weiss stated that Genius's amnesia after the murder might indicate that he was suffering from a mental illness or defect prior to the murder. Dr. Weiss explained that "[i]f this person was in fact in an amnestic state at the time, then this would without any question be considered to be a mental defect." Dr. Weiss also noted that a "schizophrenic reaction" might have followed from the incident and concluded that

[i]n my opinion, of course, there are many long-standing conditions which are easily verifiable by history or by doctor's examinations which not only precede a particular act, but which follow it as well. Schizophrenic reaction, of course, is one such. Yet an event which can be pinpointed in time and which is a crime by law can occur in one minute or even in a few seconds and the question is whether that person with a long-standing mental condition can be of sufficiently sound mind at the exact time of the incident as to be called criminally re-

18. Dr. Koson also questioned Dr. Weiss's comments regarding amnesia. Dr. Koson noted that the extent of the amnesia that Dr. Weiss reported that Genius was suffering in the aftermath of Nesbitt's murder differed from what Koson himself had observed in 1979 and 1980. Dr. Koson maintained that given this and the fact that Dr. Weiss had failed to evaluate Genius's current mental state and level of amnesia (a standard practice of forensic psychiatry) their evaluations could not properly be compared.

sponsible or not responsible. It was quite clear that immediately following this crime Mr. Genius was found to be not competent to stand trial, so that we can establish at least immediately following the crime that he was not competent to stand trial. It would be quite easy, and I believe correct, to assume that during the commission of the crime he was also not competent. The very nature of the offense and its rather dramatic and bizarre actions would certainly help to indicate that this was not the action of a competent and responsible person. Finally the report of Dr. Koson makes no mention of voices from which this man stated that he was suffering and he completely eliminates the whole picture of Voodoo from his thinking and, therefore, from any relation to the crime itself. One may or may not believe in Voodoo, but to those who believe, anything is not only possible, but very probable up to and including death and commission of acts under the influence of Voodoo. I believe that the Voodoo was complicated by the schizophrenic reaction and that under these circumstances he was so out of control and so lacking in ability to control himself and to recognize the criminality of his acts, that I believe I am quite correct in stating that he was not responsible at the time of the commission of these acts.[19]

## DISCUSSION

The Court of Appeals was persuaded that Dawkins' performance did not meet the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), because Dawkins had failed to "even explor[e] a possible complete defense because offering it might weaken a partial one...." *Genius v. Pepe,* 50 F.3d at 61. The Court took specific note of a "flag[ ]" in the record (the February 20, 1980 determination that Genius was incompetent

to stand trial) that should have alerted Dawkins to the possibility of an insanity defense. In the First Circuit's view, mounting such a defense was all the more possible in light of Dr. Weiss's belated evaluation finding Genius criminally irresponsible.[20]

The standard of review is clearly set out in *Scarpa v. Dubois,* 38 F.3d 1, 8 (1st Cir.1994) (parallel citations omitted).

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. See *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. The touchstone for determining whether an attorney's performance falls below the constitutional norm is whether counsel has brought "to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* at 688, 104 S.Ct. at 2064. The inquiry has two foci. First, a reviewing court must assess the proficiency of counsel's performance under prevailing professional norms. *See United States v. Natanel,* 938 F.2d 302, 310 (1st Cir.1991), cert. denied, 502 U.S. 1079, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992). This evaluation demands a fairly tolerant approach; after all, the Constitution pledges to an accused an effective defense, not necessarily a perfect defense or a successful defense. See, e.g., *Lema v. United States,* 987 F.2d 48, 51 (1st Cir. 1993); *Natanel,* 938 F.2d at 309. And, moreover, since even the most celebrated lawyers can differ over trial tactics in a particular case, a reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

The second line of inquiry ... entails a showing of a "reasonable probability that, but for counsel's unprofessional errors, the

---

**19.** In his second report, Dr. Weiss commented on Genius's then condition stating that "[i]n terms of mental status examination currently, I do not believe that this man was now showing any signs of psychosis and there was no difficulty in each of us understanding the other. I believe his insight and judgment were adequate so as that he [could] be called competent at the time when I saw him."

**20.** The First Circuit stated that "[a]s to prejudice from counsel's neglect, we have but to look at the statement of the Superior Court judge (the same one who had tried the case) that he was granting a new trial because the report of Doctor Weiss gave him 'deep concern.'" *Genius v. Pepe,* 50 F.3d at 61.

result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

The Commonwealth maintains that had the record before the First Circuit included Dr. Pawlowski's report, Dr. Fein's report, Dr. Koson's reports, the transcript of Genius's arraignment, and the full state court docket, it would have been evident that Dawkins possessed all of the facts necessary to evaluate an insanity defense before he settled on the strategy he pursued at trial. This is so, the Commonwealth argues, because the additional documents demonstrate that Dawkins was familiar with the details of the extensive clinical history compiled from Genius's arraignment to his trial, unlike the defense counsel in the case cited by the First Circuit, *Profitt v. Waldron,* 831 F.2d 1245 (5th Cir. 1987). Compare *Green v. Johnson,* 116 F.3d 1115, 1123 (5th Cir.1997). The record is clear that Dawkins was present at each significant legal event during this history (with the possible exception of one hearing where the docket is unclear as to who was present).

The Commonwealth notes that the truncated record presented to the First Circuit might have created the impression that Dawkins had become involved in Genius's case only upon his court appointment in July of 1980 rather than when he was retained in July of 1979. Moreover, because the record before the Court of Appeals did not include Dr. Fein's and Dr. Pawlowski's reports (or the two intervening forensic reports that have apparently been lost), it might also have appeared that the sole evaluation upon which Dawkins relied was that of Dr. Koson. The rescript of the decision in *Genius v. Pepe,* 50 F.3d at 61, lends credence to the Commonwealth's contention, as it states the facts in terms that are limited to Dr. Koson's participation in the case, that is, "[t]o meet the fear that he was not competent to stand trial, defendant had been sent to Bridgewater and the fear was confirmed on February 20. It was not until May that competency was found. While incompetency to stand trial is not equivalent to insanity, it is a serious

condition, that should have flagged the possibility [of an insanity defense]."

While it is true that Genius was temporarily found incompetent by Dr. Koson, two (and perhaps four) other psychiatrists reached the opposite conclusion. Dr. Koson's opinion was based on his belief that Genius was suffering from a situational depression caused by his arrest and incarceration, an opinion that does not entail any finding of criminal irresponsibility.[21] Under the circumstances, I cannot say that Dawkins' failure to seek the opinion of yet a fourth (or sixth) psychiatrist can be faulted under the first prong of *Strickland.*

The Commonwealth also argues that even if Dawkins' conduct is to be faulted, Genius cannot establish "a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Scarpa v. Dubois,* 38 F.3d at 8. The Court of Appeals found two factors significant in its determination of prejudice: Dr. Weiss's reports (presumably because they indicate that a psychiatrist could have been found willing to opine that Genius was insane) and Justice Brady's comment that Dr. Weiss's reports gave him "deep concern" (presumably suggesting that Justice Brady would have admitted such an opinion at trial). The problem is that neither supposition is true. Any attentive trial judge would have recognized that an opinion like Dr. Weiss's was inadmissible under the test for insanity set out in *Commonwealth v. McHoul,* 352 Mass. 544, 546–47, 226 N.E.2d 556 (1967). Under the *McHoul* standard

> "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law."

*Id.* at 546–547, 226 N.E.2d 556. Dr. Weiss's opinion can be interpreted in one of two ways, either to mean that a belief in Voodoo is itself a mental disease or defect or that anyone who is judged incompetent after arrest for "a rather dramatic and bizarre"

---

**21.** Genius's arrest and incarceration obviously occurred after the murder and does not necessarily reflect on Genius's mental state at the time of

the crime. By contrast, the defendant in *Profitt,* supra, had been in a mental institution before the crime was committed.

crime must be criminally insane because "[i]t would be quite easy, and I believe correct, to assume that during the commission of the crime he was also not competent. The very nature of the offense and its rather dramatic and bizarre actions would certainly help to indicate that this was not the action of a competent and responsible person." The latter proposition is not true as a matter of fact or law, while the former and more central tenet of Dr. Weiss's thinking is simply addled. While Voodoo might plausibly seem a bizarre and irrational system of belief to a mind acculturated in Western thought, it does not follow that its adherents thereby suffer from a mental disease or defect. There are plenty of irrational beliefs running loose in Westernized society—astrology is a mundane example—whose followers are not considered clinically insane. Cf. *Church of the Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 2225, 124 L.Ed.2d 472 (1993) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection").

Moreover, Justice Brady's lament makes no sense in the context of the issue this court has to decide, whether Dawkins' representation of Genius was in fact ineffective. Justice Brady specifically stated that he had "recently reviewed the entire transcript and find it hard to imagine what else Mr. Dawkins could legitimately do in this type of case. He comported himself as a talented advocate. He did not fail to protect his client at any time during the trial." Memorandum and Opinion of July 7, 1987, at 2. Whatever Justice Brady might have had in mind in granting a new trial (most probably he misunderstood the Supreme Judicial court's comments regarding an insanity instruction), it was certainly not ineffective assistance of counsel.

Genius contends that whether Dawkins' decision to limit himself to a *Gould* defense was developed deliberately or by default it was still an indefensible choice. Genius argues that because Dr. Koson testified that Genius was not suffering from a "mental illness" at the time of the killing, (the term Justice Brady used when instructing the jury on the relevance of Genius's mental state to a theory of premeditation), Dawkins' defense addressed only one of the alternative theories of first degree murder.

While it is true that Justice Brady inartfully told the jurors at one point that if they were to "find that the defendant had a mental illness, then [they] may consider that on the issue of deliberate premeditation," he also told them that "[t]he psychiatric testimony in this case may be considered by you to distinguish between intent in the sense of conscious desire, planning in the sense of considering the mechanical feasibility of effectuating that desire, and premeditation in the sense of critically evaluating the pros and cons of proceeding to effectuate the desire, thereby explaining in understandable terms how a defendant could logically entertain an intent, plan the effectuation of that intent, but not deliberately premeditate regarding the objective of that intent."

It will be remembered that Dr. Koson testified that it was his medical opinion that Genius did not have the ability to premeditate, to calculate, or plan the crime because Genius's "state of mind was not consistent with the ability to calculate or understand the consequences of what he was doing [given that] ... he was too agitated and in too much turmoil in that his behavior had literally taken him over at that time." The jury, after three hours of deliberation, asked two questions: (1) "Define ... 'extreme atrocity'"; and (2) "What is the correct verdict if the murder was committed with extreme atrocity, but the defendant was suffering from some pressing mental condition (but not a mental illness)?" Justice Brady repeated his instructions on extreme atrocity and cruelty, and reminded the jury that a verdict of murder in the second degree would be warranted if the evidence established mental impairment. The only reasonable inference that can be drawn from the jury's questions is that they had decided the premeditation issue in Genius's favor and had turned to the prosecution's alternative theory of murder with extreme atrocity and cruelty. At the time of Genius's trial, Massachusetts practice required only a general verdict in murder cases—the jury was not required to specify the theory underlying a conviction of murder in the first degree. Trial Tr. at 525–526.

See *Commonwealth v. Devlin*, 335 Mass. 555, 567–568, 141 N.E.2d 269 (1957). Compare *Commonwealth v. Berry*, 420 Mass. 95, 111, 648 N.E.2d 732 (1995). Had the jury found premeditation, they would have had no reason to inquire as to the Commonwealth's alternate theory of murder by extreme atrocity and cruelty.

### ORDER

After consideration of the expanded record, the Commonwealth's motion to dismiss the petition for habeas corpus is *ALLOWED*.

SO ORDERED.