## COMMONWEALTH *VS.* LOUIS LAURORE.

Middlesex. April 5, 2002. - June 6, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Assistance of counsel, Voir dire, Voluntariness of statement, Instructions to jury, Capital case. *Armed Assault with Intent to Murder. Mental Impairment. Evidence,* Competency, Hearsay.

In a murder case, the judge did not err in denying the defendant's motion for a new trial without an evidentiary hearing, where the defendant did not satisfy his burden of raising a substantial issue with regard to his claim that he suffered from a substantial organic brain impairment that would have supported a defense and an instruction on the issue of the defendant's criminal responsibility, and would have provided further support for his defense of diminished mental capacity that rendered him unable either to form the specific intent to kill or to premeditate. [72-77]

This court rejected various claims raised by a criminal defendant relating to the issue of his mental competence at the time of trial, where the relevant information and evidence before the trial judge did not raise a "bona fide doubt" as to the defendant's competence. [77-80]

At a murder trial, the judge did not err in failing to conduct a voir dire on the voluntariness of the defendant's statements to police officers and to the victim's brother, nor was defendant's counsel ineffective for failing to request a voir dire, where the issue of voluntariness was not made a live issue at trial, and where defense counsel's decision not to request a voir dire was a tactical one; further, the judge's instructions to the jury sufficiently apprised them of the Commonwealth's burden of proof. [80-81]

At a criminal trial, the judge did not err in instructing the jury on the element of assault on a charge of armed assault with intent to murder. [81-82]

There was no merit to a criminal defendant's contention that the trial judge's failure to instruct the jury on specific unanimity as to the theory of an armed assault with intent to murder charge created a substantial likelihood of a miscarriage of justice; further, defense counsel was not ineffective in failing to ask for specific verdict slips or for an instruction on specific unanimity. [82]

No substantial likelihood of a miscarriage of justice was created at a murder trial by the judge's admitting in evidence a copy of the first page of the victim's application for an abuse protection order, where any information on the application was duplicative of information contained in the actual abuse prevention order, where the evidence of the defendant's guilt was overwhelming, and where the hearsay had no bearing on the defense presented. [82-83]

INDICTMENTS found and returned in the Superior Court Department on December 7, 1995.

The cases were tried before *Hiller B. Zobel,* J., and a motion for a new trial, filed on October 25, 1999, was heard by him.

*Beth L. Eisenberg,* Committee for Public Counsel Services, for the defendant.

*David W. Cunis,* Assistant District Attorney (*Beth M. Merachnik,* Assistant Attorney General, with him) for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree by reason of deliberate premeditation, armed assault with intent to murder, and violating an abuse prevention order. Represented by new counsel, the defendant filed a motion for a new trial claiming that his trial counsel furnished him with constitutionally ineffective representation. The defendant appeals from the convictions and from the denial of his motion for a new trial. The defendant claims that a new trial is warranted because (1) the judge improperly denied his motion for a new trial; (2) he was not competent to stand trial; (3) his trial counsel should have requested, and the judge should have conducted, a voir dire concerning whether statements he made were voluntary; (4) the judge gave constitutionally defective jury instructions on voluntariness; (5) the judge gave constitutionally defective jury instructions on the element of assault on the armed assault with intent to murder charge; (6) the judge failed to instruct on unanimity as to the theory of armed assault with intent to murder; and (7) the judge erroneously admitted in evidence a copy of the first page of the victim's application for an abuse protection order. We reject these arguments. We also conclude that there is no basis to exercise our power pursuant to G. L. c. 278, § 33E, to order a new trial or reduce the defendant's murder conviction to a lesser degree of guilt. Accordingly, we affirm the judgments of conviction and the order denying the motion for a new trial.

The jury were warranted in finding the following facts. The defendant and the victim each immigrated to the United States from Haiti. They married in August of 1994, and lived in an apartment in Somerville. The victim had a seven year old

daughter; the defendant was not the child's father. The victim had family living in the area, including her brother, Joseph Paul Joujoute, his wife, Magine Augustine, and their two young children. The defendant owned and operated an automobile repair shop in Somerville.

The defendant and the victim experienced marital conflict. On November 13, 1995, the victim filed a complaint for protection against abuse pursuant to G. L. c. 209A against the defendant in the Somerville Division of the District Court Department. A temporary abuse prevention order entered, and, on November 22, 1995, the order was extended for one year.[1] Upset about the order, the defendant called Augustine seeking the victim's telephone number. He told Augustine that he did not get married to get a divorce, that he was not going to leave his wife, and that he was "going to make the wedding come out of [his wife's] mouth." The defendant continued to call Augustine and Joujoute over the next few days seeking the victim's telephone number.

In late November, 1995, the defendant's long-time friend, Yves Redon, visited him at his shop. To Redon, the defendant seemed "mellow," and was working, joking around, talking and laughing. On November 28, the defendant called Redon and informed him that he would be leaving for Florida on the following day, having his sister look after the shop.

At approximately 8 A.M., on November 29, 1995, Augustine heard a knock at her apartment door. Leaving Joujoute and their baby in bed, Augustine went to answer the door, asking who was there. She heard her niece, the victim's daughter, reply, and opened the door. The defendant stood behind the victim's daughter and asked for Joujoute. Augustine told the defendant that Joujoute was sleeping. The defendant pushed Augustine aside and headed toward the bedroom.

The defendant entered the bedroom. Joujoute was lying in bed with the baby. The defendant said, "I kill[ed] your sister and I will kill you too." The defendant took one hand out of his pocket, pointed a gun at Joujoute's face, and said, "I'm going

---

[1]The defendant was not present at the hearing on the victim's complaint, but he did appear at the November 22, 1995, hearing to extend the temporary abuse prevention order.

to shoot." Joujoute attempted to duck down as the defendant fired, but was struck by a bullet in his shoulder.

Joujoute then heard several "click[ing]" sounds. He struggled with the defendant and saw a gun fall to the floor. The defendant took out another gun and struck Joujoute in the head with it. Joujoute continued to struggle with the defendant. Augustine telephoned the police. Eventually the defendant fled, still in possession of the second gun.

Minutes later the police arrived. The victim's daughter, who had been crying and was shaking, told police that the defendant had shot her mother. Police later found the victim's body slumped against a door jamb at her apartment. She died from a single gunshot wound to her head. She had been shot in the face, the gun pressed directly on the skin below her left nostril when fired.

Later that day, at approximately 1:30 P.M., the defendant was stopped by State Trooper Richard Range for walking in the breakdown lane on Route 128, just north of the Route 9 interchange. The defendant provided Trooper Range with a false name and date of birth. The defendant stated that he was coming from a friend's house in Boston and was headed to New York. The defendant never appeared ill or injured, only "a little nervous." After the initial exchange, the defendant appeared to be having some degree of problems understanding English. After informing the defendant that pedestrians could not use the highway, Trooper Range gave the defendant a ride to a public telephone in Newton.

The following day, November 30, 1995, the defendant went to the home of a friend of one of his sisters. The defendant forced his way inside, but left after the woman refused to let him use the telephone and gave him a small amount of money. At 7:30 P.M., the defendant was arrested by Waltham police officers, after having been spotted walking the streets. He was transported to Somerville after his booking.

The defendant, through a Creole interpreter, gave a detailed statement to Lieutenant (now Captain) George McLean of the Somerville police and State Trooper Thomas Joyce, admitting to having shot the victim. The defendant explained that he and the victim had been having marital problems for about eight months.

He spoke of the financial burden on him of having to support his four children who lived in Haiti, and of the pressures from the victim and her family. The defendant stated that threats from the victim's family caused him to purchase two guns, which he kept in his shop. No one else knew about the guns.

The defendant stated that the night before he killed the victim, he took the guns home to his apartment and decided to kill himself. He called Redon and told him that he was going to Miami, then set out personal belongings in a place for his family to find. The defendant was not able to sleep that night, and arose early the next morning, at about 7 A.M., then showered and dressed. He put both guns in his pockets and went to the victim's apartment. He stated that he planned to ask the victim to return to him, and if she refused, to kill himself.

The defendant explained that he waited outside the victim's apartment for her to come out. As the victim came out of the apartment with her daughter, the defendant approached her. The victim reminded the defendant of the protective order and told him that she did not want to speak with him. She refused the defendant's request to go inside to talk, saying she did not need a man like him, and then pushed the defendant. The defendant told the victim that he was going to kill himself. The victim told him to "go ahead." Next, the defendant stated, "There will now be two deaths," pulled out a gun, pointed the gun at the victim, told the victim he was going to shoot her in the mouth for being disrespectful of him, and shot the victim in the face.

The defendant told the police that he would have shot himself but he did not want the victim's daughter to be left alone. He briefly thought about taking the victim's daughter to school, but decided against it due to the protective order. The defendant took the victim's car keys, cleaned off the snow from the victim's car, and drove the victim's daughter to Joujoute's apartment.

The defendant admitted that he used the victim's daughter to get Augustine to open the door to the apartment. He recounted walking into the bedroom and confronting Joujoute. The defendant stated that he pulled Joujoute out of bed to avoid hurting the baby. He then punched Joujoute and struck him in the head with one of the guns, saying that he was going to

make Joujoute "pay" for the things he had said about the defendant. The defendant recalled dropping one of his guns. He told the officers that he did not recall shooting Joujoute. The defendant stated that he believed that he was out of ammunition, otherwise he would have shot Joujoute and then himself.

The defendant recalled that after fleeing Joujoute's apartment, he spent hours walking. He did not take the victim's car because he planned on killing himself. He pulled out one of his guns to shoot himself, but ended up throwing the gun into the Charles River when he realized it had no ammunition. After getting lost trying to go to Cape Cod to jump off a bridge, the defendant decided to go to New York and jump off a bridge there. The defendant told the officers that he tried to get himself hit by a car by walking on the highway. He acknowledged getting stopped by a State trooper, and giving the trooper a false name and date of birth. He stated that he provided false information to the State trooper to avoid getting arrested because if he were arrested, he would not be able to kill himself. The defendant tried to make contact with family and friends, but no one would speak to him. He explained to the officers that he was "acting crazy" and felt threatened by Joujoute and other relatives.

At trial, the defendant did not dispute the fact that he shot and killed the victim in the presence of her seven year old daughter. Instead, the defendant's trial counsel primarily argued, based on the principles stated in *Commonwealth* v. *Gould*, 380 Mass. 672, 681-683 (1980) (*Gould*), that the defendant, on November 29, 1995, had a diminished mental capacity that rendered him unable either to form the specific intent to kill or to premeditate. In addition, the defendant's trial counsel pointed out discrepancies between Joujoute's and Augustine's statements to police on November 29, 1995, and their trial testimony, as well as discrepancies between their trial testimony and the physical evidence, arguing that the discrepancies revealed that the defendant did not possess the specific intent to murder Joujoute, but rather shot him accidentally during their physical struggle.

In support of his *Gould* argument, the defendant presented two psychiatrists, his expert witness, Dr. George L. Hardman, and a consultant with officials of the Middlesex County jail, Dr.

Milton J. Schmidt. Dr. Schmidt first evaluated the defendant on December 1, 1995, on the defendant's arrival at the jail. He found the defendant suicidal and depressed, and obtained the defendant's commitment to Bridgewater State Hospital (Bridgewater) pursuant to G. L. c. 123, § 18A. The defendant remained at Bridgewater until December 29, 1995, when he was returned to the jail. During his stay at Bridgewater, the defendant was prescribed antidepressants and was placed on "suicide watch." A record from Bridgewater indicated that the defendant had been acting "inappropriately cheerful."

On the defendant's return from Bridgewater, Dr. Schmidt interviewed him a second time. Finding the defendant to be suicidal, Dr. Schmidt again had the defendant committed to Bridgewater. The defendant remained at Bridgewater until January 16, 1996, then returned to the jail.

On May 20, 1996, Dr. Schmidt requested a third commitment to Bridgewater after the defendant reported hearing the victim's voice and appeared to be suicidal. Dr. Schmidt considered whether the defendant was saying things so that he could return to Bridgewater. Later, Dr. Schmidt obtained a report from Bridgewater indicating that the defendant had expressed a desire to stay at Bridgewater because it was quieter than the jail and he could sleep better. The defendant returned to the jail on June 19, 1996.

The defendant's expert psychiatrist, Dr. Hardman, testified that he interviewed the defendant in July and October of 1996. He concluded that the defendant suffered from a "severe major depression with psychotic features after the homicide," as well as "paranoid ideation," a form of delusional thinking. He described the defendant as having been paranoid, delusional, and irrational in November of 1995. Dr. Hardman opined that as a result of the defendant's mental illness, he was incapable of either deliberate premeditation or forming a specific intent to kill. He conceded, however, that the defendant told him that he had planned to shoot Joujoute and then himself, and that he had angry, aggressive feelings about his wife. With this informa-. tion, Dr. Hardman concluded that the defendant did have the ability to form the intent to commit suicide and that, on a "conscious level," it appeared that, in committing the crimes,

the defendant completed a course of conduct to effectuate a particular purpose and carry out a plan.

In addition to the expert testimony the defendant also presented two lay witnesses, his sister and an acquaintance, who essentially testified that in the weeks after the defendant had been served with the protective order, the defendant had difficulty eating, sleeping, and working, cried a lot, appeared distraught, sad, and depressed, and "act[ed like a] different person . . . like somebody [lose] their mind."

To rebut the defendant's state of mind evidence, the Commonwealth called its expert psychiatrist, Dr. Malcolm P. Rogers. Dr. Rogers testified that he had reviewed various documents and, on February 11, 1997, had interviewed the defendant. He found that the defendant did not have memory difficulty with respect to dates, times, places, and names. He also found the defendant's alleged "confusion" after the killing to be insignificant. Based on the absence of any major mental disorder, the defendant's ability "to follow through on a sequence of actions" as exhibited by his actions in carrying out his crimes, and various documents he reviewed, Dr. Rogers concluded that the defendant, on November 29, 1995, was not suffering from a substantial mental impairment and was capable of premeditating and forming the specific intent to kill.

The murder charge was presented to the jury on the theory of deliberate premeditation. They were also given the option of returning a verdict of not guilty or a verdict of guilty of murder in the second degree. The judge instructed the jury in accordance with the *Gould* case (this instruction was also given in connection with the assault with intent to murder charge). He was not asked to instruct the jury, nor did he give an instruction, on the issue of the defendant's criminal responsibility under *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967).

1. We first address the defendant's ineffective assistance of counsel claim. Because he has been convicted of murder, we examine this claim "to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than is the general constitutional standard for determining ineffective assistance of counsel." *Commonwealth*

v. *Frank*, 433 Mass. 185, 187 (2001). We consider "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). The defendant may prevail "even if the alleged error on the part of trial counsel does not constitute conduct falling 'measurably below' that of 'an ordinary fallible lawyer,' " *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 517 (1992); however, "[t]he burden is on the defendant to demonstrate that something inappropriate [constituting error by counsel] was likely to have unfairly influenced the jury's verdict." *Commonwealth* v. *Johnson*, 429 Mass. 745, 754 (1999).

The defendant argues that his trial counsel was "constitutionally ineffective in failing to investigate or present evidence of [the] defendant's substantial organic brain impairment," which would have supported a defense, and an instruction, in accordance with the *McHoul* case, and would have provided further support for his defense based on the principles stated in the *Gould* case. In his motion for a new trial, the defendant argued that a *McHoul* instruction "was warranted by evidence of [the] defendant's seriously impaired memory and intense suicidality shortly following the events in question." He also stated that neuropsychological testing confirmed the existence of the defendant's organic brain impairment.

In support of his motion, the defendant filed (1) an affidavit from his trial counsel; (2) an affidavit from Dr. Anthony G. Kalinowski, a psychologist who conducted a neuropsychological evaluation of the defendant, together with a copy of his report concerning that evaluation and his curriculum vitae; (3) copies of mental health records from the Department of Correction (department); and (4) an affidavit from the defendant's sister, Ninie Exilus. We summarize these documents as follows.

In his affidavit, trial counsel stated that he had considered that the defendant may have been "suffering from neurological damage or deficit affecting cognition," and that, prior to trial, he wrote a note "rais[ing] the prospect of organic impairment, and the possibility of having [the defendant] undergo a neuropsychological consult and a CAT scan." He also stated that he

learned of the defendant's having sustained a head injury "long after trial, despite the fact that pending trial, I emphasized to him that in light of our psychiatrically-based defense, it was important for me to have as complete a medical history as possible." Trial counsel also explained that he did not request an instruction in accordance with the *McHoul* case because he "did not think the evidence presented to the jury supported it."

Dr. Kalinowski conducted two neuropsychological evaluations of the defendant. In addition to the results of these evaluations, historical data obtained in interviews with the defendant, and behavioral observations of the defendant during the interviews and evaluations, Dr. Kalinowski based his conclusions on information contained in documents that he reviewed, including the defendant's trial counsel's affidavit, the affidavit of the defendant's sister, the department records mentioned above, the trial testimony of several witnesses, and previous psychological assessments conducted by Drs. Hardman, Schmidt, and Rogers. Dr. Kalinowski concluded that the defendant suffers from "organic brain pathology." He suggested that the defendant's condition may have resulted from "traumatic brain injuries obtained in car accidents" or from "chronic lead poisoning" from "drinking water from the head of a spring" outside his childhood home in Haiti. Dr. Kalinowski reasoned that, because of the defendant's organic brain impairment, a reasonable doubt existed as to the defendant's criminal responsibility for the shooting death of the victim, and that the defendant was not criminally responsible for his act of shooting Joujoute. He also concluded that, because of the defendant's organic brain impairment, the defendant (1) was unable deliberately to premeditate murder; (2) was unable to form the specific intent to kill his wife; (3) was unable to form the requisite intent necessary for the crime of murder; (4) did not voluntarily give a statement to police following the victim's killing; and (5) was not competent to stand trial.

The department records included copies of 1997 mental health evaluations and treatment plans, as well as progress notes. The defendant claimed that these records demonstrated the defendant's "questionable cognitive functioning." Notations in these records indicated that the defendant denied a history of head

injury, and that the examiners questioned whether he was malingering.

The affidavit of the defendant's sister recounted an automobile accident in February or March of 1980, in Haiti, in which the defendant had suffered a head injury. Exilus had been a passenger in the vehicle; the defendant had been driving. After the accident, Exilus stated that the defendant experienced "a very bad headache . . . which lasted for at least two days." He also experienced a bloody nose. Although her brother "felt sick for a long while" after the accident, complained of "agonizing headaches" and vision problems, which have continued to present, and has had occasional memory lapses, he did not seek treatment. Exilus also described various personality changes in the defendant since the accident, and stated that the defendant had been in another automobile accident "worse than the first." During the defendant's trial, she reported the defendant stated to her, "sometimes it is like I am absent, and other times I am there."

The motion judge, who was the trial judge, denied the defendant's motion for a new trial without an evidentiary hearing. In his memorandum denying the motion, the judge concluded that the defendant did not receive constitutionally ineffective assistance of counsel, but rather that trial counsel "wrung everything from the case that he possibly could." We conclude that the defendant did not satisfy his burden of raising a substantial issue concerning the existence of an organic brain impairment. See *Commonwealth* v. *Lopez*, 426 Mass. 657, 663 (1998). Thus, the judge did not err in denying the defendant's motion for a new trial without an evidentiary hearing. See *id.* at 666. See also *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990).

Trial counsel's affidavit indicated that he had attempted to compile "as complete a medical history as possible" for purposes of pursuing a "psychiatrically-based defense." Yet, the defendant failed to disclose to trial counsel his claim that he had previously sustained a head injury on one or two occasions, in automobile accidents. Curiously, trial counsel did not identify from whom, or from what source, or even precisely when he eventually learned of the defendant's claimed head injury. The

assertion likely came from either the defendant himself, who conveniently had been able to recall and recount for Dr. Kalinowski facts and circumstances of one automobile accident and resulting head injury, or from the defendant's sister, Exilus, who made no mention of any head injury or automobile accidents to the defendant's trial counsel before trial or at the trial itself. Without being advised of this information, trial counsel did not act unreasonably in choosing not to hire a neuropsychological expert. Cf. *Commonwealth* v. *Appleby*, 389 Mass. 359, 371, cert. denied, 464 U.S. 941 (1983) (defendant cannot charge counsel for lack of preparedness when defendant failed to cooperate with counsel). The record suggests as well that the judge discredited Exilus's affidavit in its entirety. Based on the fact that she failed to reveal the claim about the defendant's head injury before or at trial, the judge would have been amply warranted in disbelieving her.

The fact that trial counsel may have been aware that the defendant exhibited confusion, memory problems, amnesia, painful headaches, and cognitive impairment does not require a contrary result. Dr. Kalinowski's suggestion that these symptoms may have been indicative of a brain impairment due to chronic lead poisoning was pure speculation unsupported by evidence and not presented to trial counsel. Further, the defendant's psychiatric expert, Dr. Hardman, as well as the Commonwealth's expert, acknowledged and considered the above described symptoms and conditions. They were consistent with symptoms underlying Dr. Hardman's eventual diagnosis, severe major depression with psychotic features, as outlined in the Diagnostic and Statistical Manual published by the American Psychiatric Association (DSM). Dr. Hardman also sought a complete history from the defendant, and based on that history, ruled out, consistent with the directives of the DSM, the possibility that these symptoms derived from drug or alcohol abuse, or some other source such as that now claimed. Consequently, on this record, we cannot say that trial counsel was unreasonable in relying on Dr. Hardman's expertise, which, incidentally, was not challenged during the nonevidentiary hearing on the

motion for a new trial.[2] See *Commonwealth* v. *Hardy*, 426 Mass. 725, 731-732 (1998) (where trial counsel considered defendant's mental condition and obtained expert, counsel not ineffective in not proceeding with mental impairment defense). Contrast *Commonwealth* v. *Roberio*, 428 Mass. 278, 279 (1998) (defense counsel failed to investigate lack of criminal responsibility at all despite notice of that issue, and made own assessment of defendant's mental health).

It makes no difference that trial counsel considered, but did not, in fact, obtain a neuropsychological consultation, because no basis existed for one. Put differently, a contention that trial counsel was ineffective to the point that a constitutional wrong has occurred is not sustained in these circumstances: (a) trial counsel has engaged a qualified psychiatrist to explore defenses pertaining to the lack of criminal responsibility and diminished capacity; (b) the expert, trial counsel, and others, are aware of, and have considered, the defendant's symptomatology of possible brain damage; and (c) the premises that underlie the neuropsychologist's opinions are either disbelieved (claims of an automobile accident or accidents causing head injuries) or speculative (lead poisoning).

We thus agree with the Commonwealth's characterization that, at its core, this claim is simply no more than a newly discovered evidence assertion repackaged in the trappings of an ineffective assistance of counsel claim in order to avoid the obstacle that the "new evidence" motivating the claim is not new. See *Commonwealth* v. *Ramirez*, 416 Mass. 41, 47 n.12 (1993); *Commonwealth* v. *Genius*, 402 Mass. 711, 714 (1988); *Commonwealth* v. *Osorno*, 30 Mass. App. Ct. 327, 333 (1991). The defendant has not demonstrated an error by trial counsel sufficient under § 33E to warrant relief.

2. The defendant raises various claims relating to the issue of his mental competence at the time of trial. We reject the claims because the relevant information and evidence before the judge did not raise a "bona fide doubt" as to the defendant's

---

[2]At that hearing, the defendant's counsel only stated that, if an evidentiary hearing were held, Dr. Kalinowski would testify that a psychiatrist is not qualified to interpret a neuropsychological test and function.

competence. See *Commonwealth* v. *Barnes,* 399 Mass. 385, 389 (1987); *Commonwealth* v. *Hill,* 375 Mass. 50, 54 (1978).

Although the defendant presented a defense based on the principles stated in the *Gould* case, neither of his experts found him to be incompetent to stand trial. The question of competency was not brought up until the seventh day of trial, when trial counsel informed the judge that, on the previous evening, the defendant had been screaming in his cell and crying uncontrollably. Trial counsel also stated he was not surprised to learn of the contents of a note that the judge had received from Dr. Schmidt. In his note, Dr. Schmidt informed the judge that he had interviewed the defendant on the previous day and found him to be suicidal. Dr. Schmidt recommended that the defendant "have a psychiatric evaluation as soon as possible after the trial to evaluate his safety." Nowhere in his note did Dr. Schmidt question the defendant's competence to stand trial. Trial counsel expressed to the judge that the defendant appeared "much calmer" than the prior evening, but requested some time to speak with him before the day's proceedings commenced. The judge allowed this request.

After a recess, trial counsel reported back to the judge that the defendant was "much better," and that he thought the defendant understood their discussion about the strategic decisions concerning the lesser included offenses and the defendant's right to testify. The judge offered to conduct a colloquy. Trial counsel stated that he would find that "helpful." The judge stated that he was "trying to establish . . . whether the defendant is competent," and would conduct a colloquy about the defendant's testifying.

The judge proceeded to ask the defendant a series of questions concerning his right to testify or to not testify. The majority of his questions called for either a "yes" or a "no" answer. The judge concluded that the defendant "is fully competent to proceed, and that he understands his rights with respect to testifying or declining to testify."

The judge was not conducting a competency hearing in the strict sense. Rather, the judge inquired of the defendant with the dual purpose of first satisfying himself that the defendant understood his right to testify or not to testify, and then to

determine whether a formal competency hearing was necessary. On this record, this approach was more than what was required on the issue of the defendant's competence. Trial counsel had informed the judge that the defendant was doing "much better."[3] The fact that the defendant had experienced a single episode of emotional distress was not sufficient by itself to raise a "bona fide doubt" as to his competence to stand trial. See *Commonwealth* v. *Painten*, 429 Mass. 536, 543 (1999).

Dr. Schmidt's note does not alter this conclusion. The note indicated that the defendant appeared to be suicidal. Even an entirely rational defendant would be depressed, and might be suicidal, during a murder trial where the proof against him is substantial, and where he is facing life imprisonment with no possibility of parole. After his arrest, the defendant had appeared to be suicidal on several occasions, warranting three separate pretrial commitments to Bridgewater. As previously stated, Dr. Schmidt did not question the defendant's competency to stand trial. Even if the defendant had attempted suicide during his episode of distress (he did not), a suicide attempt alone does not always "create[] a doubt concerning the defendant's competency." *Commonwealth* v. *Lameire*, 50 Mass. App. Ct. 271, 277 (2000), quoting *United States* v. *Loyola-Dominguez*, 125 F.3d 1315, 1318-1319 (9th Cir. 1997).

Finally, on this issue, the affidavit and report of Dr. Kalinowski, and the department records, submitted in support of the defendant's motion for a new trial, do not require a different result. "[T]he question here is not why counsel failed to request a competency hearing or why the court failed to hold one on its own initiative, but whether, no less on hindsight than by foresight, there were elements of such indication in the situation

---

[3]We reject the defendant's contention, based in part on his trial counsel's affidavit submitted in support of his motion for a new trial, that his trial counsel was ineffective in "fail[ing] to fully set out his doubts about the defendant's competency to stand trial." As we previously explained, trial counsel's expert witnesses observed and considered the defendant's memory problems, confusion, and cognitive impairment, yet did not find him incompetent to stand trial. The only additional factors that entered into the equation were the defendant's single episode of deterioration and Dr. Schmidt's assessment that the defendant appeared to be suicidal. For the reasons stated in the text, these factors did not suffice to raise a doubt concerning the defendant's competence.

as, if proper notice had been taken of them, could present a substantial question of possible doubt as to [the defendant's] competency to stand trial." *Commonwealth* v. *Hill, supra* at 54, quoting *Rhay* v. *White*, 385 F.2d 883, 886 (9th Cir. 1967). We conclude that no such question was raised, and that the judge acted reasonably on the facts before him. *Commonwealth* v. *Barnes, supra* at 390.

3. We reject the defendant's claims that the judge should have conducted a voir dire on whether his statements made to police, following his arrest, and made to Joujoute, were voluntary, and that his trial counsel was ineffective for failing to request a voir dire. We also conclude that the judge's instructions on voluntariness did not create a substantial likelihood of a miscarriage of justice.

"A judge has 'no duty to ask the jury to pass on voluntariness unless it is made a live issue at trial.' " *Commonwealth* v. *Benoit*, 410 Mass. 506, 511 (1991), quoting *Commonwealth* v. *Alicea*, 376 Mass. 506, 523 (1978). The issue of voluntariness was not made a live issue at trial. Rather, the record suggests that trial counsel's failure to request a voir dire on voluntariness was a tactical decision. As is evident from trial counsel's failure to file a motion to suppress the statements, his opening statement, his cross-examination of police officers, and his closing argument, trial counsel used the defendant's statements to bolster his defense pursuant to the *Gould* case. If trial counsel requested a voir dire, there was a likely risk that the very statements that supported the defense would have been excluded. In addition, trial counsel did not solicit an opinion on voluntariness from Dr. Hardman, his expert psychiatrist. "Appellate review is not intended 'to afford an opportunity, from the vantage point of hindsight . . . to attempt to convert the consequences of unsuccessful trial tactics and strategy into alleged errors by the judge.' " *Commonwealth* v. *Benoit, supra* at 517, quoting *Commonwealth* v. *Lee*, 383 Mass. 507, 512 (1981).

Trial counsel only once requested an instruction in accordance with our "humane practice," see *Commonwealth* v. *Tavares*, 385 Mass. 140, 149-152, cert. denied, 457 U.S. 1137 (1982), after the Commonwealth showed a videotape of the defendant's booking at a police station in Waltham. The judge gave the

instruction, and trial counsel lodged no objection. The defendant's appellate counsel now argues that the instruction did not explicitly place the burden of proving voluntariness beyond a reasonable doubt on the Commonwealth, thereby shifting it to the defendant. Appellate counsel also argues that the judge limited the jury's consideration of voluntariness only to those statements the defendant made to the police, rather than to police and civilians (namely Joujoute).

We conclude that no substantial likelihood of a miscarriage of justice occurred. See *Commonwealth* v. *Tavares, supra* at 149. As previously stated, there was no substantial issue of involuntariness in this case. Further, in his final instructions to the jury, the judge repeatedly instructed that the Commonwealth bore the burden of proving, beyond a reasonable doubt, that the defendant was guilty of the offenses charged. He also emphasized to the jury that a person accused of a crime is presumed innocent, and that the defendant had no obligation to introduce evidence or to persuade the jurors of anything. Thus, the jury were sufficiently apprised of the Commonwealth's burden of proof. See *Commonwealth* v. *Doucette*, 391 Mass. 443, 456-457 (1984).

4. We now decide the defendant's remaining arguments.

(a) The judge instructed the jury as follows on the offense of armed assault with intent to murder:

> "The government must prove beyond a reasonable doubt that the defendant, in possession of a dangerous weapon, that is, a weapon, a device capable of inflicting serious bodily harm, with that weapon assaulted, that is, threatened Mr. Joujoute with the specific intent of killing him. Not merely injuring him seriously or even merely frightening him, but rather [with] the intent of killing him.

> "By threatening, I mean placing him, Mr. Joujoute, in fear. Not necessarily fear of death, but fear that the dangerous weapon was going to be used against him physically. And you may take into account all of the circumstances. Now bear in mind, that here again, the government must prove a specific intent, that is, the intent to kill. . . . I might add that the government must also prove that there

> was no justification, or excuse, or mitigation. Mitigation being defined as the heat of passion induced by sudden combat or reasonable provocation."

The defendant maintains that this instruction was constitutionally defective on the element of assault, in that it, particularly the definition of "threatening," permitted the jury to convict the defendant finding only that Joujoute was actually placed in fear, and eliminating the requirement that the Commonwealth prove that the defendant specifically intended to place Joujoute in fear, see *Commonwealth* v. *Musgrave*, 38 Mass. App. Ct. 519, 524 (1995), *S.C.*, 421 Mass. 610, 611 (1996), an essential element of the offense. The defendant adds that trial counsel was ineffective in failing to object to the instruction.

We reject the defendant's contentions. Under the judge's instructions, the jury would not have returned a verdict of guilty unless they found that the Commonwealth had proved, beyond a reasonable doubt, that the defendant specifically intended to kill Joujoute, not just that Joujoute was actually fearful. Further, the evidence in this case supported an "attempted battery" theory of assault, see *Commonwealth* v. *Gorassi*, 432 Mass. 244, 248 (2000), and, in view of the jury's verdict on this offense, there is no substantial likelihood that the jury could *not* have found that the defendant attempted to batter Joujoute. There was no substantial likelihood of a miscarriage of justice.

(b) We are unpersuaded by the defendant's argument that the judge's failure to instruct on specific unanimity as to the theory of the armed assault with intent to murder charge created a substantial likelihood of a miscarriage of justice. The indictment on this charge, and evidence adduced to prove this charge, did not involve a number of unrelated incidents, but rather one event, supported by alternate factual theories. See *Commonwealth* v. *Ramos*, 31 Mass. App. Ct. 362, 366-368 (1991). It follows that the defendant's trial counsel was not ineffective in failing to ask for specific verdict slips, or for an instruction on specific unanimity as to the theory of culpability.

(c) We reject the defendant's contention that the erroneously admitted copy of the first page of the victim's application for an abuse protection order created a substantial likelihood of a miscarriage of justice. Although the victim placed a check mark

indicating that the defendant had caused her physical harm, and that hearsay was not cumulative of other admitted evidence, the remaining information on the form was duplicative of information contained in the actual abuse prevention order; the evidence of the defendant's guilt was overwhelming (there were eyewitnesses to the crimes and he admitted to shooting the victim); and the hearsay had no bearing on the defendant's *Gould* defense. See *Commonwealth* v. *Johnson,* 429 Mass. 745, 749-750 (1999).

5. We have reviewed the record pursuant to our duty under G. L. c. 278, § 33E. We see no reason to reduce the verdict of the jury on the murder charge, or to order a new trial. The judgments and the order denying the motion for a new trial are affirmed.

*So ordered.*